# Wytheville

Rose H. Simmons, and Others v. Eudora Eva Whitlow Simmons.

June 9, 1941.

Record No. 2381.

Present, Campbell, C. J., and Hudgins, Gregory, Browning and Spratley, JJ.

*Irby Turnbull, Thomas C. Gordon, Jr.,* and *Parrish, Butcher & Parrish,* for the appellants.

*Crews & Clement* and *Hutcheson & Hutcheson,* for the appellee.

HUDGINS, J., delivered the opinion of the court.

The object of this suit is three-fold: 1st, to have a paper writing, wherein the widow of W. L. Simmons stated that she would accept the provisions of her husband's will, declared null and void; 2nd, to compel the

executor to pay the widow her distributive share of the personal property; and, 3rd, to have dower assigned in the lands of which her husband died seized and possessed. From a decree granting the prayer of the bill, the other legatees and devisees sought and obtained this appeal.

The only error assigned is the refusal of the chancellor to declare that the widow was bound by her written acceptance of the provisions of the will of her husband. The decision necessarily turns upon the facts.

W. L. Simmons, on October 27, 1932, when he was 48 years of age, married Eudora Eva Whitlow, his third wife, who was then 24 years of age. The parties met in the Memorial Hospital, Danville, Virginia, where Miss Whitlow had been engaged as professional nurse by Mr. Simmons, then a patient in the hospital. Soon after the marriage, Mr. Simmons' health became seriously impaired and in 1934, at his request, his sister, Miss Rose Simmons, gave up her position in Richmond and moved to the home of her brother in Union Level, Mecklenburg county, Virginia. There she acted for and with him in the conduct of his rather extensive business affairs. Mrs. Simmons seem to have confined most of her attention—certainly during the last four years of his life—to nursing her husband, who was a semi-invalid.

His nearest relatives were two sisters, Miss Rose Simmons and Mrs. Annie Lou Wilkinson. He died on Tuesday, July 4, 1939, and was buried on Thursday. On Friday night Mrs. Simmons, the two sisters and other members of the family went to the home of Irby Turnbull, who, in the presence of all parties, read the will, which he had prepared and had retained at the request of the testator.

Under the terms of this will Mrs. Simmons and the two sisters were given $500 each. The only other provision for Mrs. Simmons was the payment of the sum of $25 per month. To secure these monthly payments the executor was directed to invest a sufficient amount

of the personal estate in a trust fund. "Upon the death of my said wife or her remarriage, I desire the said trust fund to be paid to my legatees hereunder or their descendants. This provision for my wife to be in lieu of her statutory rights." The residence at Union Level, with all the furniture, silverware and china, was devised to Miss Rose Simmons for life, with the remainder to William Leon Wilkinson, a nephew. All other personal property was devised to the two sisters in equal shares. The remaining real estate was devised to the two sisters for life, and at their death to their descendants. The executor, Virginia Trust Company, of Richmond, Virginia, was authorized to sell, at its discretion and within ten years, all the real estate except the residence at Union Level.

On Saturday, July 8, Mr. Turnbull had copies of the will typed and sent to the beneficiaries. On the same day Miss Rose Simmons sought the advice of Mr. Turnbull on the farming operations and the payment of employees;—that is, she desired to know whether she could continue the contracts made with tenants on the farms for 1940 and whether she could continue to make advances for 1939 and to pay other employees. She testified that Mr. Turnbull told her that he could not advise her on these matters until he knew whether or not Mrs. Simmons would accept or renounce the provisions made for her in the will. Following this interview, on Monday, July 10, 1939, Mr. Turnbull wrote Miss Rose Simmons the following letter:

"I herewith enclose a paper that I shall thank you to have Mrs. Simmons sign in your presence or in the presence of some other witness. The executor will want to know whether or not Mrs. Simmons elects to accept the provisions made for her under the will, and if Mrs. Simmons will sign this paper, it will facilitate the early administration of the estate. By this means, I think that I may be able to get the Executor to disburse the special legacies of $500.00 at once, and I know that I

can get them to begin the income payments under the will much earlier than I told you that they would begin.''

The paper enclosed read:

''TO THE VIRGINIA TRUST COMPANY, EXECUTOR UNDER THE LAST WILL AND TESTAMENT OF W. L. SIMMONS, DECEASED:

''In order to expedite the administration of this estate, I hereby notify you that I accept the provisions made for me in the said will. I am the widow of the said Simmons, and I have a copy of his last will and testament, and I accept the provisions made for me in lieu of all statutory rights.

''This the 10th day of July, 1939.

. . . . . . . . . . . . . . . . . . . . . . . . . . .

''Witness:''

Miss Rose Simmons did not urge Mrs. Simmons to sign the paper. She simply ''handed'' it, with the letter, to Mrs. Simmons, who, after reading both, immediately signed the document and gave it to Miss Rose Simmons, who mailed it to Mr. Turnbull.

The Virgina Trust Company was duly notified that it was named executor. On July 12, it sent its representative from Richmond to Union Level. This representative, with Mr. Turnbull and the other interested parties, met in the office of the testator and made a tentative list of the notes, bonds, stocks and other personal property. The representative, with Mr. Turnbull, went to the clerk's office in Boydton, examined the land books, ascertained the number of farms and other real estate owned by the estate and the assessed value of each parcel. Thereafter the executor qualified.

On July 22, the Virginia Trust Company paid the parties the cash legacies of $500 each. Mrs. Simmons signed a receipt stating that she accepted the money under the provisions of her husband's will. In the meantime, tenants were informed that they could continue their farming operations for 1939 and that their con-

tracts made with the testator for 1940 were valid and recognized as binding obligations upon the estate.

On August 2, 1939, Mrs. Simmons, acting under the provisions of Code, secs. 5121 and 5276, renounced in writing the provisions for her in the will and claimed her dower and distributive rights under the statutes, which writing was duly recorded in the clerk's office of the Circuit Court of Mecklenburg county.

The executor continued to send Mrs. Simmons the monthly income mentioned in the will. However, none of these checks were cashed or accepted. The executor, acting on the apparent assumption that the widow had elected to take under the provisions of the will, declined to give to the widow any part of the personal estate or take the proper steps for the assignment of dower.

At first November rules, 1939, the widow filed the bill in this case, alleging that the paper signed by her at the request of Miss Rose Simmons did not amount to an irrevocable election, and that her renunciation of the will on August 2 was made within the time stated in the statute, and concluding with the prayer for relief as stated.

To this bill the executor filed an answer stating that the controversy was between the devisees and legatees under the will, on the one hand, and the widow, on the other, and that it was not interested except to know what its duties were under the circumstances. The beneficiaries filed an answer reciting in some detail the facts leading up to and surrounding the execution of the paper bearing date July 10, 1939, and alleging that the widow had done other acts which caused the election to be irrevocable.

The pertinent Virginia statutes seem to have been enacted on the theory that it was the natural inclination of a surviving consort to accept and follow the wishes of the deceased consort as expressed in a will. The statute gives the surviving consort one year from the admission of the will to probate in which to re-

ject the provisions made for him or her. To accomplish this result the surviving consort must take positive action within the stated time. Such action must be taken in person before the court in which the will is probated, or by writing executed in the same formal manner required for the execution of deeds. There are no steps, formal or otherwise, prescribed by statute for an election to accept the testamentary provisions. No action—mere silence—for a year is conclusive.

■ Professor Minor (Minor Inst., 4 ed., Vol. II, p. 1008) states: "Clear proof of an election made must be furnished, and ambiguous acts and conduct will in general not be so construed unless in those cases where the interests of others have been affected by the acts, and require that they should be interpreted to amount to an election. * * * .

■ "The proof of an election made may be either *express,* in terms, or it may be, and most frequently is, *implied* from acts and conduct, such as acceptance and acquiescence; but in either case, it must have been with a *knowledge of the party's rights,* and with the *intention of electing."*

■ A widow may elect to accept the testamentary provisions made for her by her husband within the year, but in the event such election is alleged to have been made, the proof should be clear, cogent and convincing. The record contains proof which meets this requirement. But this is not all. The same authority, p. 1006, states: "It is well established that no one shall be constrained to make an election until the interests to which the election relates are *clearly defined,* and *their relative values ascertained;* and *an election made before that is done, will, for the most part, be disregarded,* at least if it be made under mistaken impressions as to the facts; but only upon the terms (supposing the election to have been unambiguously made), of restoring other persons

whose rights are affected by the party's act of election, to the same situation substantially as if that act had not taken place.''

The trial court found as a fact that: ''Under all the facts, circumstances, and conditions of this case; I am convinced that the widow, at the time she signed the acceptance of the will, July 10, two days before the will was probated, not only did not know what her statutory rights were but also was ignorant to a large extent of the amount of her husband's estate.''

The evidence is ample to support these conclusions. It may be analyzed as follows: (1) The paper was signed in the home of the testator which his family was then occupying, and on the sixth day after the death of the husband. (2) Rose Simmons testified that, at this time, no one knew the value of her brother's estate, nor had she discussed it with any member of the family. As she said: ''There is a great deal of sorrow which goes into such incidents as that, and material things don't count very much at that particular time.'' (3) On Friday night, three days before the paper was signed, Miss Rose had remarked that there was no money to run the home; to which the widow replied that she would be willing to stay in the home and help with the household matters and contribute part of the $25 bequeathed to her. Mrs. Wilkinson stated that she did not know how she was going to continue her children in school. The two remarks, whether so intended or not, had a tendency to create the impression upon the widow that the value of the estate was comparatively small. (4) Miss Rose Simmons secured the preparation of the paper and, in effect, requested the widow to sign it. (5) It was signed two days before the executor qualified and before even a tentative appraisal of the value of the personal property and real estate had been made. (6) While the evidence shows that Mrs. Simmons drove her husband around to the different farms, to see his attorney and on other business trips, it does not show that she had a com-

prehensive idea of the value of the property owned by her husband. (7) The evidence tended to show that the widow not only did not know the value of her husband's estate, but she did not know what her "statutory rights," mentioned in the will and in the paper she signed, meant. (8) The appraised value of the estate made after the executor qualified was, personal property, $37,486.24; real estate, $54,221.00. The distributive share of the widow in the personal property is one-half, or $18,743.12; and the then present value of her dower interest in the real estate was approximately $14,000.00, or a total value of approximately $32,700.00, as compared to $500 in cash and an annuity of $300 per year so long as the widow remained unmarried. (9) Within two weeks after the widow left the influence of the husband's family, she definitely decided to renounce the will and took the proper steps to make the decision effective.

While no one of the above incidents may have been sufficent in itself to establish the fact that the election to take under the will was revocable, considering them together, which we must do, the conclusions of the trial court are irresistible. The interests of the widow were not clearly defined to her, nor were the property values ascertained and compared. It is true that Mrs. Simmons said that she read the will and she read the papers that she signed, but at that time no witness stated that any member of the family knew the approximate value of the estate.

The statutes contemplate that a consort must be given full opportunity to compare the value of property accruing to him from either course he may elect to pursue. Code, sec. 5276, provides, among other things, that: "If any such will is of a doubtful import as to the amount or value of the property the husband or wife of such consort is to receive thereby or thereunder", then a court which may be required to construe the will must, on application, extend the time in which such consort may renounce the will. This provision indicates that

the legislature intended that, in order for an election to be effective, the party required to elect must know or have full opportunity to ascertain the relative values accruing before making an election. Accepting the testimony introduced by each side on the subject of valuation at its face value, the widow could not have made an intelligent election until there was an appraisal of the property disposed of by this will. The widow's election was sought and obtained before the executor qualified or there was any discussion among members of the family as to the amount or value of the property involved.

■ "If the election be made by the widow under the supposition that the estate devised to, and accepted by her, is free from all claims and demands, when the fact is the reverse; or if it be made before the circumstances necessary to a judicious and discriminating choice, are ascertained, then such an election will not bind her, because made under a mistake, and in ignorance of the real state of the property; and under these circumstances, she will be entitled, in equity, to relief." Scribner on Dower, 2 ed., Vol. 2, p. 519.

The general principle applicable to this situation is stated in Page on Wills, 2 ed., sec. 1219, as follows: "One who has elected without full knowledge of the material facts may subsequently change his original intention and alter his election unless the situation has so changed that this can not be done without prejudice to the subsequently acquired rights of others." See *Waggoner* v. *Waggoner,* 111 Va. 325, 68 S. E. 990, 30 L. R. A. (N. S.) 644; *Gilbert* v. *McCreary,* 87 W. Va. 56, 104 S. E. 273, 12 A. L. R. 1172; note 81 A. L. R. 740; and 17 Am. Jur. 761.

The legal rights of no one have been impaired by Mrs. Simmons' change of mind. A representative of the executor testified that the administration of the property had not been prejudiced, nor injuriously affected by the course pursued by Mrs. Simmons. See *Yorkly* v. *Stim-*

*son,* 97 N. C. 236, 1 S. E. 452; *Ward* v. *Ward,* 134 Ill. 417, 25 N. E. 1012.

The widow assigns cross-error to the order of the chancellor requiring the expenses of the litigation in the lower court to be paid by the estate.

The executor was confronted, first, with a paper signed by the widow stating that she would accept the provisions made for her in her husband's will. Later, the widow repudiated this paper, and elected to renounce the provisions for her in the will and demand her rights under the statutes. Under the circumstances, the executor would have been justified in filing a suit to obtain the aid of a court of equity in administering the estate. The widow did not wait for this action to be taken but filed the bill herself. This she had a right to do, but the uncertainty of the administration or disposition of the estate was produced by the inconsistent positions taken by her, hence she should pay her share of the expense incurred in the trial court. We find no error in the order of the trial court requiring the expenses of the litigation to be paid by the estate.

The decree of the trial court is

*Affirmed.*