CATHERINE M. MATHIS, Respondent, v. CYRUS CRANE, Executor of the Last Will and Testament of JOHN T. MATHIS, Deceased, Appellant, No. 41686—230 S. W. (2d) 707.

Division Two, April 10, 1950.

Motion for Rehearing or to Transfer to Banc Overruled, June 13, 1950.

*Nelson E. Johnson* and *Richard S. Righter* for appellant.

*Paul Barnett* for respondent.

634

 WESTHUES, C.—This action was filed by plaintiff against her husband, John T. Mathis, to set aside an antenuptial contract. A trial was had and before the final submission of the case, the defendant died. The case was revived in the name of Cyrus Crane, executor of the will of John T. Mathis, as defendant. The trial court entered a decree setting aside the contract and made a finding that the agreement was unreasonable, unfair, and unjust, and that the plaintiff had been overreached. From the judgment the defendant, executor, appealed.

This being an equitable proceeding, this court must review the case de novo.

In February, 1949, when the trial was had, plaintiff was 60 years old and the defendant 79. The defendant, John T. Mathis, was admitted to the Bar in 1896 and was associated with John H. Lucas for many years. He also served as Assistant City Counselor of Kansas City for eight years. At one time he was a traveling claim adjuster for the Union Pacific Railroad Company. He was married and in 1934 he and his wife, Rhoda, moved to California where she died in 1944. No children were born of this marriage. Mathis inherited a substantial amount of property from his wife.

Plaintiff was born in Denver, Colorado. After she graduated from school she married B. O. Lockman. Of this union two children were born. This couple was divorced in 1916. In 1918 plaintiff married Dr. Hileman and three children were born of this marriage, two of whom were living at the time of this trial. The Hilemans lived in San Diego, California. Dr. Hileman died in 1936.

In February, 1946, at a Valentine Party, Catherine Hileman, the plaintiff, and John T. Mathis met for the first time. It seems that a mutual friend, Mrs. Kirkendall, acted in the capacity of cupid in bringing about the introduction. She suggested that plaintiff and Mathis should get married since they both were single. The following Easter plaintiff sent Mathis an Easter greeting. An exchange of letters followed and marriage was mentioned. Plaintiff during the summer months advised with her children as to the advisability of marrying Mathis. Mathis was in Kansas City, Missouri, most of the summer but returned to Long Beach, California, about September. Plaintiff was to be a delegate of a lodge to a convention to be held in St. Louis, Missouri, the latter part of September. Marriage had been considered and she suggested that the marriage should take place before she left for the convention. Mathis would not agree; he wanted to have a prenuptial agreement signed before the marriage and wanted to discuss the matter with his friend, Cyrus Crane, a lawyer in Kansas City, Missouri. Plaintiff attended the convention and by appointment made by letter met Mathis at Kansas City . On the day following her arrival a visit was made to the office of Cyrus Crane and the terms of the prenuptial

636

▮▮▮▮▮▮▮

agreement were discussed. A prenuptial contract was prepared and was signed on October 1, 1946. Mathis and plaintiff then left Kansas City to go to California. They stopped over at ▮▮▮ Fort Scott, Kansas, where they were married and then proceeded to San Diego, California, where they lived in a home owned by plaintiff. A separation occurred in April, 1948. The above is only a skeleton outline of the main events as revealed by the record of the lives of plaintiff and Mathis.

The contract in question reads as follows:

"ANTENUPTIAL AGREEMENT

"MEMORANDUM OF AGREEMENT between JOHN T. MATHIS, Party of the First Part, and CATHERINE M. HILEMAN, Party of the Second Part, WITNESSETH:

"WHEREAS, both of said parties contemplate entering into the marriage relation with each other, and both are severally possessed of real and personal property in his and her own right, and Second Party has children by a former marriage, all being of age and possessed of means of support independent of their parent, and it is desired by the parties hereto that their marriage shall not in any way change their legal right, or that of the children of the Party of the Second Part, and heirs in the property of each of them, from what they are before the marriage.

"Therefore, it is agreed:

"1. The Party of the First Part agrees that he will provide during the continuance of the marriage all necessary reasonable household expenses, and in the event the Second Party sells the home now owned by her that he will provide a home for the Party of the Second Part.

"He further agrees that he will pay to the Party of the Second Part the sum of One Thousand and No/100 Dollars ($1,000.00) per year from the date of their marriage for each year, or part of a year, that they live together in the marriage relation, which amount is to become the sole and separate property of the Party of the Second Part.

"2. The Party of the First Part, agrees, in case he shall survive the Party of the Second Part, that he will make no claim to any part of her estate as surviving husband; that in consideration of said marriage the Party of the First Part waives and relinquishes all right of curtesy, or statutory right, to the real estate of which the Party of the Second Part may die seized, and all right to her personal estate as surviving husband, heir at law, or otherwise.

"3. The Party of the Second Part, in consideration of said marriage, agrees, in case she survives the Party of the First Part,

that she will make no claim to any part or share of the real or personal estate of which the Party of the First Part dies seized, and said Party of the Second Part expressly waives and relinquishes all claims to dower, homestead, widow's award, or other right in and to the real and personal estate of which the Party of the First Part may die seized.

"4. It is mutually declared that it is their intention that by virtue of said marriage neither one shall have or acquire any right, title or claim in and to the real or personal estate of the other, but that the estate of each shall descend to or vest in his or her heirs at law, legatees, or devisees, as may be prescribed by his or her last will and testament or by the law of the state in force, as though no marriage had taken place between them.

"5. It is mutually agreed that, in case either of the parties desire to mortgage or sell and convey his or her real or personal estate, each one will join in the deed of conveyance or mortgage, as may be necessary to make same effectual.

"6. It is further agreed that this agreement is entered into by each party with satisfactory knowledge on the part of each as to the property of the other; but it is their desire that their respective rights to each other's estate shall be determined and fixed by this agreement, which shall be binding upon their respective heirs and legal representatives.

"7. It is agreed between them that irrespective of their place of residence this Antenuptial Agreement shall be governed by the laws of the State of Missouri, of which State the Party of the First Part is now a citizen and resident." (Signatures and acknowledgment omitted.)

Plaintiff's suit was based on the theory that plaintiff did not understand the legal effect of the contract in question; that she was overreached by the defendant; that the consideration was grossly inadequate; also that the defendant led plaintiff to believe he was a man of small means and did not make a full disclosure of his property.

The defendant introduced an abundance of evidence to show that plaintiff was an educated and intelligent woman and had had much business experience and understood the value of stocks and bonds. This was stressed in oral argument and much space was devoted to this matter in appellant's brief. We deem it unnecessary to discuss at length the question of plaintiff's ability to understand the value of stocks and bonds or her business acumen. For the purpose of this case we shall assume that she was well versed in business matters.

It must be conceded that the defendant did not make full disclosure of his property. However, appellant takes the position that plaintiff assumed the attitude that she was not concerned about the amount of property Mathis possessed. Appellant says in the brief,

"The record shows that she was exposed to ample information from which to form a reasonably accurate idea of the extent of Mr. Mathis's means." We shall refer.to this again in the opinion.

Appellant finds fault with the trial court's finding "that Mr. Mathis told his prospective wife he was worth around $40,000." In considering this question we shall ignore entirely the evidence of plaintiff and her witnesses and shall examine the evidence given by Mathis. In August, 1948, the question of temporary maintenance was before the trial court. Mathis testified as to his property at that hearing and his evidence was in part as follows:

"Q. How much are you worth, Mr. Mathis?

"A. That is a hard question now, changes from day to day.

"Q. Perhaps, but you know about it, more than anybody else.

"A. I would say my own personal stuff, about $40,000.

"Q. How much were you worth when this marriage settlement was made?

"A. That would be hard to tell because the war was just over and the market was up and down. I couldn't tell you.

"Q. You say in your answer you told her how much you were worth, how much did you tell her?

"A. Between $40,000—I told her I had my own home out on Wornall Road and I showed it to her before we signed the agreement and I told her that I had sold it for $7500, and she knew my home in Chula Vista. I sold that for $13,000.

"Q. You told her you were worth about $40,000?

"A. I never did tell her, I told her things I had.

"Q. And they came to about $40,000?

"A. Something like that."

Mathis again testified at length when the case was heard on the merits. A most exhaustive fishing expedition by plaintiff's lawyer and much cross-examination of Mathis failed to disclose a large portion of Mathis' property. The appraisers of the estate fixed the value of the estate at $208,802.54. It was stipulated that claims against the estate would not exceed $15,000. It was also in evidence that Mathis had informed his prospective wife that most of his property was in the joint names of the defendant, John T. Mathis, and his grandnephew. Here again we may go to the evidence given by Mathis at the hearing on the question of temporary maintenance for confirmation of plaintiff's contention. Note the following:

"Q. Didn't you own those Columbia Gas and Electric Company stocks at that time?

"A. I think my nephew and.I had some, joint.

"Q. And they were in your name?

"A. No, joint, pretty near everything I had was joint.

"Q. They belonged to you?

"A. Joint. I got the revenue but if I died it was his.

"Q. But as a matter of fact it was in your name?

"A. Joint.

"Q. And you sold it and bought it?

"A. I did.

"Q. And you had $94,494.00 worth of stocks in addition to $75,000 notes you sold?

"A. I don't think I had that much.

"Q. What did you have?

"A. I don't know, because they went down to practically nothing."

We also quote from a letter written by Mathis to plaintiff. The letter was dated Long Beach, California, September 14, 1946. The first paragraph reads as follows:

"Your letter again expressing your sinsear love for me regardles of mony gratefuly received & I know you are very sinsear. And again I must confess I must of stuck way down in the dumps as I frequently do Especialy when I am by my self I saw some stocks I have down 32.00 per share and it just made the cold chills run up and down my spine and the thought of taking on more responsibilitis and if I should not be able to make good as I always have been able to do life would not be worth living. and I woud be worse than a heal to let you work it is bad enough for you to work now mutch less to support a man so I thought posibly it would be better to wait until after election & see whitch way the current runs & I could sell some of my stock & get out. I am indeed sorry if this sugestion hurt your feelings and if you still think you are not afraid to take me on for the better or the worse panicks bubble bursting booms & Ect"

In defendant's brief it was conceded that Mathis insisted that an antenuptial contract be signed. Note what is said in the brief.

"On this subject of 'overreaching' we hope that the Court will bear in mind that overreaching can cut both ways. Mathis absolutely refused to marry Mrs. Hileman until this antenuptial agreement was executed. She testified that he (Mathis) talked continuously about getting that contract signed. Mathis showed by many of the statements in his testimony that he had absolute faith that Mr. Crane had drawn a final and binding agreement."

The evidence justified a finding that plaintiff when she married Mathis was under the impression that Mathis was worth approximately $40,000; that she understood when the contract was signed that she was forfeiting all marital rights in the property of Mathis. The plaintiff testified that Mathis promised her that irrespective of the contract he would make provision for her so that she would not be compelled to work the remainder of her life. Mathis in his evidence denied that any such promise was made. The letter written by defendant Mathis under the date September 14, 1946 (quoted from

above), to some extent tends to support plaintiff's contention concerning the promise. The latter portion of the letter reads as follows:

"*No No one* has talked to me & they could not if they tried I have been frank and honest with you & if I had not believed in you I never would of made my visit down there & as you frankly state I am the only man you have ever gone out with I can say you are the only woman I ever took any place in the 27 months I have been a widower I know now why you did not want any one in San Diego make our prenuptial agreement as agreement or *no* agreement you are willing to go the full lenth even waiving all claims but I will agree to. leave you so mutch the first year & so mutch each year then after & the longer we are to gether the better I will be

"I am as ever lovingly

JT"

After the marriage plaintiff acted as Mathis' private secretary and we may say Mathis made no complaint about her work. She also performed the household duties. Neighbors testified that plaintiff took care of Mathis when he was ill. The record showed that the secretarial work was quite extensive. Plaintiff wrote many letters and attended to many of the details of Mathis' business. He was constantly dealing in stocks which required extensive correspondence. While plaintiff was performing the duties as the secretary of Mathis, she learned more and more about his property. Plaintiff testified that she trusted Mathis and thought that he would provide for her and, therefore, did not say anything about the matter until about January or February, 1948. She testified that on a rainy Sunday afternoon Mathis opened his will and read it aloud. Plaintiff had not been mentioned and when she asked Mathis about his promise to take care of her, "he just laughed and asked me if I had it in writing. I told him no. I trusted him." Mathis testified that plaintiff complained about being only a "contract wife" and wanted him to destroy the contract or make some provision for her. Note his evidence.

"Q. When did she refer to herself as a contract wife?

"A. Well, quite often she would say, 'I am not your wife, I am just a contract wife.' She said, 'You ought to fix that so my children can receive you with open arms, all of them, they have been good to you.' She said, 'What are you going to do with your money anyway?' One night I heard her sniffling in bed. I said, 'What is the matter?' I thought she was sick or something. She said, 'I am not your wife, I am just a contract wife.' She said, 'Why don't you destroy that contract?'

"Q. What did you say to that?

"A. I told her the contract was a contract. If I lived with her as long as I did with my other wife I might make other provisions.

"MR. BARNETT: You might what?

"A. I could make other provisions if I lived with her as long as I did with the other wife.".

Mathis also testified that plaintiff informed him she had seen a lawyer and that the contract was not valid.

Aside from the dispute over this contract, plaintiff and Mathis seem to have fared pretty well and apparently were happy. The trouble over the contract, however, caused a separation in April, 1948, when Mathis took most of his belongings and went to Kansas City, Missouri. Plaintiff later went to Kansas City and filed this suit. After the separation and while the suit was pending, plaintiff and Mathis met a number of times and discussed a reconciliation. The only obstacle was the contract. Plaintiff was willing to resume the marital relation if Mathis would cancel the contract or make some provision for her. Mathis insisted on holding fast to the contract. Thus, the discussion ended and the case was tried on the merits in February, 1949.

Appellant in the brief says that marriage settlements are not against public policy but are favored by the law and the courts, citing 41 C. J. S. 552, Sec. 76. That statement is correct but we also note that in Sec. 75, on the same page, it is stated, "Marriage settlements ordinarily are intended for maintenance and support, and particularly to guard the wife against the changes of fortune likely to occur in the husband's affairs." One of the principal elements to the validity of an antenuptial contract is that the prospective husband must be fair and make a full disclosure of the extent of his property. 41 C. J. S. 554, Sec. 80; 26 Am. Jur. 894, Sec. 289; Jones v. McGonigle, 37 S. W. (2d) 892, 1. c. 894 (1-4), 327 Mo. 457, 74 A. L. R. 550; Donaldson v. Donaldson, 249 Mo. 228, 155 S. W. 791, 1. c. 797 (10). In this case Mathis did not make a full disclosure of his property. Not only did he fail to make full disclosure to his prospective wife but he failed to make such disclosure to the court at the hearing for temporary maintenance. Again he failed to make a full and honest disclosure of his property when this case was tried on the merits.

We may also consider the provisions of the contract, particularly the benefits to be received thereunder by the parties, in determining whether the contract should be set aside. 26 Am. Jur. 895, Sec. 290; 41 C. J. S. 567, Sec. 97, and cases cited under note 98, p. 568.

In examining the provisions of the contract we find that the material benefits inuring to Mathis were that the plaintiff's property was to be utilized as a home until such time when the property was sold. Plaintiff performed the ordinary household duties and in addi-

tion thereto acted as the private secretary of Mathis. Mrs. Mathis also performed the duties of a nurse while Mathis was ill. Plaintiff in return received the benefits of having Mathis pay the living expenses, taxes, and insurance on the home. Plaintiff also received $1,000 per year. This latter sum, it will be noted, was to be paid only so long as the parties lived together as husband and wife. The evidence justifies the statement that plaintiff's duties as secretary to Mathis were well worth the $1,000 she received. It will also be noted that under the terms ▮▮▮ of the contract no provision was made whereby plaintiff would receive any sum of money or property or interest therein in case of the death of Mathis. The plaintiff at the time of the marriage owned a home which was in her name and that of her son. This property was valued at not more than $10,000. Mathis at the time of and prior to the marriage owned property of $200,000 or more in value. During the time the parties lived together, they traveled to some extent and Mathis was not miserly in this respect or in paying for the expenses incidental to the home. In such circumstances a court of equity should set aside the antenuptial contract on the ground that it was unfair and that Mathis failed to make a full and fair disclosure of his property. Jones v. McGonigle, supra; Juhasz v. Juhasz, 134 Ohio St. 257, 16 N. E. (2d) 328, 117 A. L. R. 993; 26 Am. Jur. 894, 895, Secs. 289, 290; 41 C. J. S. 554, Sec. 80.

Cases cited by appellant do not support the contention that the antenuptial contract in this case should have been sustained. See Logan v. Phillipps, 18 Mo. 23; Young v. Sangster, 322 Mo. 802, 16 S. W. (2d) 92; Davis v. Cook, 337 Mo. 33, 85 S. W. (2d) 17; Perry v. Perryman, 19 Mo. 469. In those cases the question of non-disclosure was not present. We find no case cited by appellant where a non-disclosure of a large portion of property did not constitute grounds to vitiate the contract. Appellant's contention that plaintiff was exposed to facts from which she should have discovered an accurate estimate of Mathis' property cannot be sustained.

Appellant next contends that plaintiff ensnared Mathis and married him to get his property or a great portion thereof. Note what is said in appellant's brief: "She said in her letter, in effect, that she was marrying him for love alone and didn't care whether he had any means or not.

"That was her tune *until she got him to marry her*. Then and only then her viewpoint changed. She whimpered about being a 'contract wife.' She demanded to know why she was not remembered in his will. When Mathis paid her the first installment of $1,000 in 1947 she demanded to know whether 'He was going to hold her to that contract' and he said he was. At that point Mathis was already hooked. He was married to her. He could not get out of it. If Mathis had had the slightest idea before the marriage of the attitude

that Mrs. Hileman took after they were married, he never would have married her." There is no doubt that plaintiff was anxious to be married to Mathis. It is equally true that plaintiff was under the impression that she would better her position in a financial way. Plaintiff testified that Mathis promised to make provision for her irrespective of the prenuptial contract. She stated that Mathis advised her not to mention this promise of his to Mr. Crane; that that was a matter between themselves. As we stated above, the only corroboration of plaintiff's evidence on this point was the letter of Mathis dated September 14, 1946, wherein he wrote to plaintiff "you are willing to go the full lenth even waiving all claims but I will agree to leave you so mutch the first year & so mutch each year then after & the longer we are together the better I will be." Mathis denied making any such promise. The trial court was in a better position to judge this matter than this court. Mathis testified as to his property on the question of temporary maintenance and again at the trial on the merits. On both occasions he disclosed a disposition that was neither fair nor honest in regard to giving the court information as to his property. The trial court found against Mathis on this disputed issue and we are not convinced that we should disturb that finding.

Appellant urges further that Mrs. Mathis accepted benefits under the antenuptial contract and thereby ratified the same and is estopped from attacking its validity. Here again the trial court was in a better position to determine the question than an appellate court. The evidence justifies a finding that when plaintiff learned she had not been mentioned in ▮▮▮ Mathis' will and he refused to make any other provision for her except what was provided for in the contract, she complained to Mathis and reminded him of his promise. From then on there was a dispute between plaintiff and Mathis. Negotiations for a reconciliation continued until long after this suit was filed. Plaintiff insisted that Mathis make some provision for her or destroy the contract. Mathis held fast to the contract and did make a payment to plaintiff as required. This payment was charged against plaintiff in the trial court's decree. There can be no ratification unless the facts are fully known to the party charged with ratification and estoppel. 17 C. J. S. 520, Sec. 165(b); 12 C. J. S. 996, Sec. 38.

In this case the facts were not fully disclosed until the inventory of Mathis' estate was filed. Appellant is in no position to assert waiver, estoppel, or ratification. The cases cited by appellant, Young v. Sangster, supra; Davis v. Cook, supra; and McBreen v. McBreen, 154 Mo. 323, 55 S. W. 463, do not hold otherwise. Estoppel in those cases was sustained on other grounds. The question of knowledge of all the facts was not present in any of those cases.

What we have said makes it unnecessary to discuss or consider questions briefed by appellant and respondent as to the meaning and effect of Sec. 334, R. S. Mo., 1939, as affecting the merits of this case.

The decree of the trial court is hereby affirmed. *Bohling* and *Barrett, CC.,* concur.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court. All the judges concur.