# Richmond

## Barbara R. Batleman, Et Al., Etc. v. Augusta Zuber Rubin.

June 14, 1957.

Record No. 4665.

Present, All the Justices.

The opinion states the case.

*Herman A. Sacks* (*Gordon E. Campbell; Alan S. Mirman; Charles L. Kaufman; William L. Parker, Jr.; Stant & Mirman; Sacks & Sacks,* on brief), for the appellants.

*Edward L. Breeden* (*Robert R. McMillan; Breeden, Howard & MacMillan,* on brief), for the appellee.

Hudgins, C. J., delivered the opinion of the court.

Augusta Zuber Rubin instituted this suit in chancery against the National Bank of Commerce of Norfolk, executor of the estate of William Rubin, her deceased husband, and the beneficiaries named in his will, praying that the court construe an antenuptial contract made between her and testator, certain parts of the will, and to declare: (1) whether the antenuptial contract was valid and binding on her; (2) whether the will of William Rubin cancelled or terminated the antenuptial contract; (3) whether $15,000 found in testator's safe deposit box was an asset of testator's estate or the property of two of the respondents, Jacob H. Rubin and Barbara R. Batleman; (4) whether she is under any obligation to assume in whole or in part the cost of maintaining the house formerly occupied by her and her husband. She also prayed for an extension of the time allowed by Code, §§ 64-14 and 64-33, for her to elect whether to take under the will or to renounce the same.

The trial court, after due notice and without objection, entered an order extending the time for complainant to make an election whether to accept or renounce decedent's will, waive jointure and demand dower.

The parties agreed for the court to determine, on an *ore tenus* hearing, the validity of the antenuptial contract and to continue to a later date the determination of all other issues raised by the pleadings.

At the conclusion of a full hearing, the court, by decree, declared that the antenuptial contract was void and of no binding force or effect. From this decree, and the order granting complainant an extension of time in which to elect whether to accept or renounce the will, waive jointure and demand dower, respondents obtained this appeal.

The dominant question raised is whether the antenuptial contract is valid and enforceable against the widow, complainant in the lower court and hereinafter designated appellee.

█ We have been cited to no case in this jurisdiction, and we have found none, setting forth the essential elements of a valid antenuptial contract. However, the general rule derived from the decisions in other jurisdictions is well stated in Lindley, Separation Agreements and Ante-Nuptial Contracts, Annotated, Revised Edition, § 90, p. 794, as follows:

"To render an ante-nuptial agreement valid, there must be a fair and reasonable provision therein for the wife, or—in the absence of such provision—there must be full and frank disclosure to her of the husband's worth before she signs the agreement, and she must sign freely and voluntarily, on competent independent advice, and with full knowledge of her rights."

█ With this general rule in mind, we now review the facts admitted in the pleadings and established by the evidence. In 1947 appellee was a widow, 44 years of age, with two grown sons and one daughter 14 years of age. She operated a small millinery and hat shop in Portsmouth, where she lived. In the latter part of 1946 or early 1947, she met William Rubin, who was a widower, 54 years old, and the father of two children, a son, Jacob H. Rubin, 24 years old, and a married daughter, Barbara R. Batleman, 18 years old. He lived in Norfolk and was the owner and operator of the Fidelity Storage and Salvage Company and traded in real estate. Sometime in late April or early May of 1947, the parties became engaged and arranged to be, and were, married on July 28, 1947, in Richmond, Virginia.

On July 26, 1947, two days prior to the marriage, the parties executed an antenuptial contract, wherein William Rubin promised to leave appellee, his intended wife, the sum of $20,000 at his death, agreed that she should have dower in all real estate thereafter acquired by him and to relinquish his prospective marital rights in her property. In consideration of the promises made by her prospective husband, appellee released, remised and relinquished "all of her rights

of every kind and character, whether marital, dower, or by virtue of the statutes of descent and distribution in and to any and all real or personal property now owned by the said William Rubin, and any other right or claim in and to the estate of the said William Rubin, which may in any manner arise or accrue by virtue of said marriage." It does not appear that appellee owned any real estate and little, if any, personal property at the time the contract was executed. Furthermore, all of the promises made by the prospective husband for the benefit of appellee were made upon the condition "that she will have continued to live with the said William Rubin up to the time of his death."

The parties apparently lived happily together until October 29, 1954, when William Rubin died, disposing by will of an estate of the appraised value of $509,887.37, consisting of personalty valued at $228,812.37, real estate valued at $151,075, and life insurance policies valued at $130,000. Under the terms of the will, bearing date November 8, 1950, the executor was directed to pay to appellee the sum of $20,000, "in full settlement of my obligations under a pre-nuptial agreement made by us, dated July 18, 1947," and acknowledged July 26, 1947. The will further provided that the trustee of two trust funds created by the will, one for the testator's daughter and her issue, and the other for his son and his issue, should pay appellee the sum of $100 per month so long as she lived with the daughter in the home at 1209 Brandon Avenue, Norfolk, and $200 a month if she resided elsewhere.

Decedent devised his one half interest in the home at 1209 Brandon Avenue, and all the furnishings therein, to his daughter, Barbara R. Batleman, who owned the other one half interest, and requested that the daughter permit appellee to live in the home so long as she desired to do so, but if appellee's living in the home was not agreeable to either appellee or the daughter then appellee should vacate the same. By codicil bearing date August 12, 1954, decedent devised and bequeathed to his wife, appellee, for life, a cottage at Virginia Beach together with all the furniture and household goods therein.

It is stated in Article IV, paragraph (i) of the will that: "The provisions herein made for my wife, Augusta Zuber Rubin, are in lieu of dower and in full settlement of all her other rights in and claims against my estate, including those arising under the antenuptial agreement made between us."

There is some conflict in the evidence as to the value of decedent's

property on July 26, 1947, when he and appellee executed the antenuptial contract. C. E. Craver, a certified public accountant and a witness for appellee, testified that he had made a thorough and careful examination of all of decedent's available books, accounts and papers to ascertain his net worth at that time. He listed various assets owned by decedent in 1947, and found the total value to be $248,136.87, and testified that decedent's adjusted gross income for the years 1946, 1947 and 1948 was $34,564.88, $46,606.42 and $40,132.88, respectively.

Respondents introduced William A. Old, a certified public accountant, who testified that in his opinion the net value of deceased's estate in 1947 was only $94,494. He made no formal report nor filed an itemized list of the property as witness Craver did. In any event, the learned chancellor heard the testimony of both witnesses, noted their appearance on the witness stand, their manner of testifying, and accepted the testimony of Craver. Under these circumstances this finding of fact is conclusive upon this court.

Parties who are engaged to be married occupy a confidential relationship toward each other, and in executing an antenuptial property settlement they are under high obligation to make a full and frank disclosure of all facts and circumstances involving the property rights to be affected by such settlement. *Mathis* v. *Crane*, 360 Mo. 631, 230 S. W. 2d 707, 27 A. L. R. 2d 873, Anno. 883; *Jones* v. *McGonigle*, 327 Mo. 457, 37 S. W. 2d 892, 74 A. L. R. 550, Anno. 559; *Suhor* v. *Gooch*, 244 Fed. 361; 26 Am. Jur., Husband and Wife, p. 893, § 288.

There is no evidence in the record showing that decedent made any disclosure to his intended wife as to the value of the property then owned by him, or that she knew the value of such property. However, he induced her, for and in consideration of $20,000 *to be paid at his death*, to surrender all of her rights of every kind and character in and to any and all property then owned by him. It is stated in the briefs that the value of such property was $240,130.67, and according to the report of Craver to consist of personalty valued at $123,006.87 and realty valued at $125,130, or a total of $248,136.87. In other words, the intended wife agreed to accept a sum payable on the death of her intended husband of less than one third of the value of her rights, if married, in the property owned by him on the day the contract was signed.

The foregoing evidence raised a presumption that the intended

husband did not make a full and frank disclosure to his intended wife of the fair value of the property then owned by him, and imposed upon respondents the burden of rebutting this presumption by introducing affirmative proof that he made such disclosure or that appellee had knowledge of the value of such property.

"Where the property allowance to a spouse under an antenuptial property settlement is disproportionately small in relation to the amount which would have been received under the marriage laws, the courts will presume that such an arrangement would not be voluntarily acceded to, and will give effect to a presumption that the other party designedly concealed the extent of his property interests at the time of making the contract, so that the party seeking to sustain the agreement will be under the burden of bringing forward affirmative proof of knowledge on the part of the complaining spouse sufficient to meet or overcome the presumption." 27 A. L. R. 2d, Anno. 885.

The only evidence depicting the circumstances under which the antenuptial contract was signed is the testimony of appellee, who said that after she and William Rubin had been engaged to be married for more than two months, and after her required blood test had been made, he "called me one day and wanted me to come meet him in Norfolk. I had my shop in Portsmouth, and, if I recall correctly, he said he wanted to see me about some business and please come over to Norfolk and meet him. So, I left the store and he met me at the ferry on the Portsmouth side and came over and walked down to this National Bank of Commerce Building, and, on the way over to the building Mr. Rubin said, 'Honey, you know we are going to get married, and I want to make you a gift of $20,000.00. I want you to have some money of your own.' He said, 'I want you to come up to my lawyers' office to sign some papers.' I said, 'What kind of papers?' and he said, 'You know I buy and sell real estate, and since you are in business, to keep me from running back and forth or you coming over to sign deeds, I had rather you sign this paper, it would make it much easier for both of us.' Then we came up to Mr. Sacks' office."

When they entered the attorney's office, he handed them a paper which she said she glanced at and saw that reference was made therein to $20,000, which she thought was the $20,000 gift her fiancé had mentioned to her. They were in the attorney's office for only a few minutes. Neither her intended husband nor the attorney read the

contract or explained its provisions to her. She said that she knew the contract "said something about real estate. I had no reason to question him, it was two days before our marriage and I had utmost confidence in him. Nobody explained, and I did not know, it was just news to me." As soon as the paper was signed and notarized her fiancé took it and she never saw it again until just before he died.

Appellee further testified that during their courtship and engagement decedent said that he was in business and was "able to provide comfortably for me." She did not know and made no inquiries concerning the value of his property. After the marriage the parties returned to Norfolk where they lived together, the husband giving his wife a monthly allowance to cover household expenses. At times she found the allowance inadequate to meet these expenses and asked her husband about the $20,000 she understood he had promised to give her. He treated the question lightly at first, but finally, upon her insistence and just before he died, he gave her a copy of the contract and she then realized for the first time that the $20,000 was not to be paid her prior to his death.

Respondents contend that the decree declaring the antenuptial contract invalid is erroneous because it was based on the testimony of appellee, which, it is argued, was not corroborated as required by the provisions of Code, § 8-286.

This contention is unsound. It is not supported by the record. Appellee made out a *prima facie* case when she proved, without the aid of her own testimony, that: (1) while she was engaged to William Rubin they executed an antenuptial contract; (2) thereafter they were married; (3) the consideration stated in the antenuptial contract was unreasonably small in proportion to the value of the property then owned by the intended husband. Proof of these facts, without more, as heretofore stated, raised a presumption that appellee did not know, and was not fully and frankly informed by decedent of the value of the property then owned by him, and cast upon respondents the burden of meeting or overcoming the presumption. Respondents failed to carry this burden. It follows that the decree was not based on uncorroborated testimony of appellee. See, *Leckie* v. *Lynchburg Trust, etc., Bank*, 191 Va. 360, 60 S. E. 2d 923.

Respondents' next contention is that the lower court did not have jurisdiction to extend the time for appellee to elect whether to accept the benefits made for her in the will or to renounce the same.

Code, § 64-13 allows the surviving spouse one year from the time

the will is probated to accept or renounce the provisions therein made for him or her. Code, § 64-32 gives a widow the right, within a year from the death of her husband, to waive jointure and demand dower. Code, §§ 64-14 and 64-33 provide that if the will or the conveyance creating jointure is of doubtful import as to the amount or value of the property the surviving spouse or widow is to receive thereby or thereunder, and a suit in equity is pending wherein the will or conveyance will be construed in such respect, the court shall, on the application of the surviving spouse in the one case or the widow in the other, extend the time of election for a period not longer than six months from the date of the final order in the suit.

The basis of respondents' contention is that there was no suit pending to construe the will and, even if there were, neither the antenuptial contract nor the will is of doubtful import as to the amount or value of the property appellee would receive thereunder.

There is no merit in this contention. In the first place, respondents did not object to the entry of the order extending the time for appellee to make her election when it was entered on September 1, 1954. On May 25, 1955, some nine months thereafter, and more than a year after the death of decedent and the probate of his will, respondents made their first objection to the order and moved to set it aside. This objection and motion came too late.

Furthermore, this is a suit to construe a will of doubtful import as to the amount or value of the property bequeathed and devised to appellee. Both the antenuptial contract and the will were made a part of appellee's bill, wherein it is alleged that decedent undertook by his will to change, without her consent, the provisions made for her benefit in the antenuptial contract. The two instruments place appellee in an anomalous position—if she accepts the benefits made for her in the antenuptial contract she forfeits the benefits made for her in the will, and conversely, if she accepts the provisions made for her in the will she surrenders the right to dower in all of the real estate acquired by decedent after the marriage, the value of which real estate was said to be $56,900.

It is also alleged in the bill that the ownership of part of the property standing in the name of decedent at the time of his death was claimed by other parties. Indeed, Jacob H. Rubin, in his cross bill, claims an oral trust in certain real estate conveyed by him to the decedent.

When these allegations are read in connection with the prayer of

the bill, heretofore stated, and the claims asserted in the cross bill, the doubtful import of the value or amount of property bequeathed and devised to appellee is apparent.

The decision of the trial court, now affirmed by this court, renders the antenuptial contract invalid and unenforceable. It follows that appellee has a right to accept the provisions made for her under the will, or to renounce the will and demand her statutory marital rights in all of the property of which her husband died siezed and possessed. We said in *Simmons* v. *Simmons*, 177 Va. 629, 638, 15 S. E. 2d 43, that: "The statutes contemplate that a consort must be given full opportunity to compare the value of property accruing to him from either course he may elect to pursue. Code, sec. 5276, [now Code, § 64-14], provides, among other things, that: 'If any such will is of a doubtful import as to the amount or value of the property the husband or wife of such consort is to receive thereby or thereunder', then a court which may be required to construe the will must, on application, extend the time in which such consort may renounce the will. This provision indicates that the legislature intended that, in order for an election to be effective, the party required to elect must know or have full opportunity to ascertain the relative values accruing before making an election." Of course, such an election, or a proper application for an extension of time, must be made within the period stated in the statute.

For the reasons stated the order and the decree of the trial court are affirmed.

*Affirmed.*