FELTON, C.J.,
concurring.
I concur with the majority that the antenuptial agreement at issue is valid and enforceable. In my view, however, the majority errs in holding that only the law of the Virgin Islands is applicable in determining the validity and enforceability of the agreement. I would hold that credible evidence in the record supports the trial court’s judgment that Virginia law governs the validity and enforceability of the agreement and that the agreement is valid under the controlling law in Virginia at the time the agreement was signed.[20]
I.
As the majority notes, pursuant to Virginia’s traditional choice of law principles, “[everything relating to the making of the contract is to be governed by the law of the place where it was made.” Arkla Lumber & Mfg. Co. v. West Virginia Timber Co., 146 Va. 641, 650, 132 S.E. 840, 842 (1926). *143 However, if the evidence indicates that the “express intention of the parties” is for the law of a specific jurisdiction to govern the validity of the contract, the law of the designated jurisdiction will be applied instead. C.I.T. Corp. v. Guy, 170 Va. 16, 22, 195 S.E. 659, 661 (1988). If the parties merely sign the contract in one jurisdiction, but at the time of execution, they intend for the contract to be fully performed in another, specific jurisdiction, the law of the place of performance will be applied rather than the law of the place where the contract was formally executed. See Arkla, 146 Va. at 650, 132 S.E. at 842.
Viewing the evidence in the light most favorable to husband, the prevailing party below, the record reflects that the agreement was prepared and provided to wife in Virginia, well in advance of the marriage; that husband encouraged wife to have it reviewed before signing it; and that husband read the agreement aloud to wife before she signed it. The agreement itself reflects that, at the time of its signing on July 12, 1983, the parties both resided in the City of Portsmouth, Virginia. Both parties were employed in Virginia, had recently purchased their marital residence in Virginia, and intended to return immediately to their jobs and families in Virginia following the wedding. The text of the agreement made specific references to Virginia law as the primary law to be applied, reciting expressly in paragraph three that the relinquishment of any claims either party might acquire in the other’s property would be governed “under the present or future laws of the state of Virginia, or any other jurisdiction.” (Emphasis added). The agreement also made specific reference to Virginia Code § 64.1-13, regarding the waiver by each to claim an elective share in the deceased spouse’s augmented estate. Moreover, on their return to Virginia following the brief trip to the Virgin Islands for their wedding, the parties acknowledged their signatures to the agreement before a Virginia notary public, thereby ratifying the agreement in Virginia. Accordingly, I would hold that credible evidence in the record demonstrates that the parties intended for the agreement to be governed by Virginia law.
*144 II.
At the time the parties signed the agreement in 1983 the law of Virginia generally governing premarital agreements was as articulated in Batleman v. Rubin, 199 Va. 156, 98 S.E.2d 519 (1957). In Batleman, a prenuptial agreement, also entered into prior to the enactment of the Premarital Agreement Act in Virginia, was declared invalid. Id. at 164, 98 S.E.2d at 525. In Batleman, the Supreme Court noted:
To render an ante-nuptial agreement valid, there must be a fair and reasonable provision therein for the wife, or—in the absence of such provision—there must be full and frank disclosure to her of the husband’s worth before she signs the agreement, and she must sign freely and voluntarily, on competent independent advice, and with full knowledge of her rights.
Id. at 158, 98 S.E.2d at 521 (citing Lindley, Separation Agreements and Ante-Nuptial Contracts, Annotated, Revised Edition, § 90, p.794). In Batleman, two days prior to the wedding, husband asked wife to meet him concerning business, told her he wanted to give her $20,000, and that they needed to go to his lawyer’s office to sign some papers. Id. When the parties arrived at husband’s lawyer’s office, wife was handed a document and asked to sign it. Id. She testified that they were in the office only a few minutes, that “[n]either her intended husband nor the attorney read the contract or explained its provisions to her,” and that she signed it because “it was two days before our marriage and I had the utmost confidence in [husband].” Id. at 161-62, 98 S.E.2d at 523. Wife was not given a copy of the signed agreement and “never saw it again until [husband] died.” Id. at 162, 98 S.E.2d at 523.
At the time the parties signed the antenuptial agreement in Batleman, wife had little property of value, while husband then was worth nearly $250,000 and had substantial income. Id. at 160, 98 S.E.2d at 522. The court determined that the consideration provided for wife in the antenuptial agreement was unreasonably small in proportion to the value of the *145 property then owned by her intended husband and that proof of those factors created a presumption that she did not know, and was not “fully and frankly informed” by her intended husband of the property owned by him. Id. at 162, 98 S.E.2d at 524. The Court noted that “[t]here is no evidence in the record showing that [husband] made any disclosure to his intended wife as to the value of the property then owned by him, or that she knew the value of such property.” Id. It found that husband failed to rebut the presumption that he had not made full disclosure of his property or “that [wife] had knowledge of the value of such property.” Id.
In the current case, each party was fully aware of the other’s assets and property prior to the signing of the agreement. Indeed, the very terms of the agreement acknowledge as much. The record demonstrates that neither of the parties had any appreciable assets at the time of their marriage. At the time that the agreement was signed, husband’s law practice was just beginning and producing little income. Wife’s income was, at most, moderate. Moreover, the parties disclosed their respective financial circumstances to each other when, a few months prior to the time they signed the agreement, they completed a joint mortgage loan application to finance the purchase of their marital residence. Husband’s finances were such that he was unable to obtain a loan to purchase the residence based on his financial standing alone.
The trial court found that wife received the proposed prenuptial agreement in Virginia “months in advance” of the actual signing of the document in the Virgin Islands; that she had assisted her brother in preparing an antenuptial agreement; and that she had worked in a law office which regularly handled divorce cases, and where one of the lawyers was a divorce commissioner. The record reflects that wife had ample opportunity to seek independent legal advice concerning the agreement prior to signing it and that husband read the agreement aloud to wife immediately prior to her signing it. Each party was fully aware of the assets of the other, and each mutually promised the other to relinquish any rights to property of the other acquired during the marriage. Accord *146 ingly, I would hold that, consistent with law in effect when the parties signed the agreement, the agreement is valid and enforceable under Virginia law.
CONCLUSION
For these reasons, I would hold that the trial court did not err in its judgment that the antenuptial agreement executed by the parties was a valid and binding agreement under Virginia law.

. See Code § 20-149 (enacted in 1985). See also Batleman v. Rubin, 199 Va. 156, 98 S.E.2d 519 (1957).