HANNAH COLBERT, Appellant, *vs.* LUCY J. RINGS *et al.* Appellees.

*Opinion filed December 17, 1907.*

1. WITNESSES—*when alleged incompetency of a witness cannot be considered on appeal.* An objection that a certain witness who testified in the case was incompetent under section 2 of the Evidence act cannot be considered on appeal, where there is no assignment of error upon the action of the court in admitting testimony.

2. ANTE-NUPTIAL CONTRACTS—*when an ante-nuptial contract is binding upon the wife—burden of proof.* If an ante-nuptial contract is entered into by the wife under circumstances which would

render valid any other written contract which she was competent to execute, it is binding upon her; provided, however, that if there is no provision for her or the provision made is disproportionate to the husband's property, persons relying upon the contract must prove that the wife had full knowledge, or was chargeable with knowledge, of the nature and value of the husband's property.

3. SAME—*homestead may be barred by an ante-nuptial contract.* An ante-nuptial contract, signed and acknowledged by the parties, which in terms bars the widow's right to homestead will have that effect after the death of the husband, provided no minor children are left who are entitled to share the homestead with the widow. (*McMahill* v. *McMahill,* 105 Ill. 596, overruled.)

4. SAME—*what does not render an ante-nuptial contract invalid.* The fact that the intended wife could neither read nor write does not render an ante-nuptial contract invalid, where the evidence shows that she fully understood the contract, had actual knowledge of the nature, character and value of the intended husband's property, and that she expressed herself as satisfied with the contract when he executed it, by making her mark.

5. SAME—*marriage and mutual covenants constitute sufficient consideration.* The mutual covenants of the parties to an ante-nuptial contract, in which each waives and releases all rights in the property of the other, constitute, as does also the fact of marriage, sufficient consideration for the contract.

DUNN, J., dissenting.

APPEAL from the Circuit Court of McDonough county; the Hon. JOHN A. GRAY, Judge, presiding.

On September 7, 1906, Hannah Colbert, appellant, filed her bill in the circuit court of McDonough county against Lucy J. Rings and the other legatees and devisees and the executor of the will of Thomas S. Colbert, deceased, appellees, seeking dower and homestead, widow's award and thirds in the estate of the deceased. From the decree of that court dismissing the bill for want of equity, after a hearing in open court, the record has been brought to this court by appeal.

It was stipulated by the parties to the suit that Thomas S. Colbert departed this life testate on April 24, 1906, leav-

ing Hannah Colbert, the appellant, his widow, and Lucy
J. Rings, William Colbert, Armeda Pearce, Della Kline,
Emma Andrews and Charles Colbert, his children and only
heirs-at-law; that at the time of his death he was the owner
in fee simple of a tract of real estate occupied by himself
and wife as a homestead, in the city of Macomb, in McDon-
ough county, Illinois, and of personal property amounting
to $5000; that appellant filed her written renunciation of
the will of the deceased in the county court of said county
on September 7, 1906, and that complainant has continued
to occupy the real estate up to the time of the filing of
the bill.

To the bill defendants filed an answer, which admitted
that dower, homestead and widow's award had not been
assigned to complainant, and interposed as a defense an
ante-nuptial contract, which is as follows:

"Articles of agreement made this 27th day of February,
A. D. 1900, by and between Thomas S. Colbert, of the
town of Bethel, in the county of McDonough and State of
Illinois, party of the first part, and Hannah Pendell, of
the city of Macomb, in the county of McDonough and State
of Illinois, party of the second part:

"*Witnesseth:* That whereas the parties to this contract
have been considering the question of entering into the
marriage relations with each other; and whereas, each
party to this contract has been married before and now
have children and descendants by former marriage rela-
tions; and whereas, each party to this contract also has
some individual property, both personal and real, and as
neither party to this contract is desirous of sharing in the
property of the other on account of said marriage relations
which may be entered into between the parties hereto:

"Now, therefore, it is agreed and covenanted by and
between the parties hereto, and they do hereby pledge them-
selves, that they will enter into the said marriage relation
with each other within the next thirty (30) days, in ac-

cordance with the terms of this contract; and it is further agreed and covenanted by and between the parties hereto that each one of the contracting parties shall have absolute control and management of his or her own property, free from any molestation or interference on the part of the other.

"It is agreed and covenanted by the party of the first part, in consideration of the agreements and covenants of the party of the second part hereinafter contained and of the fulfillment of said marriage contract, that he will, so long as said marriage relation which is to be entered into between the parties shall exist, that he will furnish a good and comfortable home for them to live in, and provide proper support, except as otherwise herein expressed, for the said party of the second part.

"It is further covenanted and agreed by the party of the first part, in consideration of the fulfillment of said marriage contract and covenants herein contained on the part of the party of the second part, that he will, and he hereby does, waive, relinquish, remise and forfeit any rights or interests he might have or be entitled to in the property of the party of the second part, on account of said marriage, by or under the laws of the State, hereby expressly waiving all rights that he may have or might acquire of homestead, dower, curtesy or other interests in said property.

"It is covenanted and agreed by the party of the second part, in consideration of the fulfillment of the covenants herein contained on the part of the party of the first part, that she will perform the part of a good and faithful wife and look after the comfort and welfare of the party of the first part so long as said marriage relations shall exist and as the party of the first part shall properly provide for her, except in the matter of clothing and doctors' bills for herself and her funeral and burial expenses, which she hereby covenants and agrees to furnish and pay out of her own private means.

"It is further agreed and covenanted by the party of the second part that she will, and she hereby does, in consideration of the fulfillment of the covenants on the part of the party of the first part to be kept and fulfilled and herein contained, waive, release, relinquish, remise and forfeit all right of homestead, dower, widow's award or any other interest that she might have or be entitled to on account of said marriage, by virtue of the laws of this State, in and to any of the property of the party of the first part.

"It is further covenanted and agreed by and between the parties hereto, that should either of the parties desire to sell or convey any of the realty belonging to himself or herself, the other party will unite in said conveyance without any further consideration.

"It is mutually covenanted and agreed that all the covenants and agreements herein contained shall extend to and be obligatory upon the heirs, executors, administrators and assigns of the respective parties.

"In witness whereof the parties to these presents have hereunto set their hands and seals the day and year first above written.

THOMAS S. COLBERT,     [Seal.]

HANNAH $\overset{\text{her}}{\underset{\text{mark.}}{\text{X}}}$ PENDELL.     [Seal.]

H. H. STEPHENS,
T. Z. CREEL,

Witnesses to Hannah Pendell's signature."

The contract was acknowledged in accordance with the requirements of the statute with reference to the release and waiver of the estate of homestead.

Appellant, at the time of the execution of the above contract, was about seventy-one years of age and could neither read nor write. Thomas S. Colbert was about the same age, and each had adult children by a former marriage. Upon the hearing she testified that she knew nothing of the contract until about two weeks before the death of Thomas S. Colbert, and that she had never signed it.

Appellees offered in evidence the ante-nuptial contract and the will of Thomas S. Colbert, which was executed on April 14, 1900, about three weeks after his marriage to appellant. By it he devises and bequeaths all his property, both real and personal, to his children. The only reference to the rights of the wife is contained in the third clause, which reads as follows: "It is my desire and will that my beloved wife, Hannah Colbert, shall by virtue of this will have no part of my estate, it having been settled by us, before we were married, by a written contract what portion of my estate she should have." By the eighth clause he recites that the amount of compensation to be received by the executor has been fixed by a written agreement entered into by himself and T. Z. Creel, who was nominated and appointed as executor.

Creel, who in his capacity as executor was one of the defendants, testified, on behalf of defendants, that he drew the contract in question at the request of Thomas S. Colbert, and that appellant came to his office some time during the week before it was signed, and at that time he read it over and explained it to her, and the extent of Colbert's property was then discussed, and she expressed herself as being satisfied with the contract; that at the time it was executed, Colbert, appellant, H. H. Stephens and himself were present, and at the request of appellant he signed her name to the instrument and assisted her in making her mark; that he and Stephens then signed as witnesses to the mark; that Colbert signed, and that as notary public he (Creel) then took the acknowledgment of appellant and Colbert to the instrument. It was admitted that the name of H. H. Stephens appearing on said contract as that of a witness to the mark of appellant was Stephens' genuine signature.

The assignment of errors is as follows: "First, the circuit court erred in finding that there was no equity in complainant's bill of complaint and in dismissing said bill;

second, the circuit court erred in rendering said decree against appellant; third, said circuit court erred in rendering the decree which it did against appellant for costs."

NEECE & ELTING, for appellant.

CHARLES W. FLACK, and L. B. VOSE, for appellees.

Mr. JUSTICE SCOTT delivered the opinion of the court:

It is contended by appellees that the alleged agreement, a copy of which is set out in the foregoing statement, was drawn by T. Z. Creel and signed in his presence by appellant and her husband, Colbert, now deceased, prior to their marriage. Creel is the executor of the will of Colbert and testified in this cause on the part of appellees. Appellant, by an objection in the circuit court, raised the question of his competency, insisting that he was incompetent to testify against appellant under the provisions of section 2 of chapter 51, Hurd's Revised Statutes of 1905, for the reason that in his capacity as executor he was a party to the suit, and for the further reason that he had, according to appellant's contention, an interest in the result of the suit. The same objection is urged here by the brief and argument filed on behalf of appellant, but, as is insisted by appellees, we are precluded from considering this question for the reason that the action of the court in admitting testimony is not assigned as error. *Swift & Co.* v. *Fue,* 167 Ill. 443.

The contract in question is binding upon the wife if it was entered into by her under circumstances which would render valid any other written contract which she was competent to execute, provided, however, that if no provision is made for the wife, or if the provision made for her is disproportionate to the property of the intended husband, taking into consideration the rights given her by the law in the property of her husband in the event of his death prior to her death, then a presumption exists that the execution of the instrument was brought about by a designed

concealment on the part of the husband of the amount of property owned by him. In that event, those claiming adversely to the wife have the burden of showing by the proof that at the time she executed the agreement she "had full knowledge of the nature, character and value of the intended husband's property, or that the circumstances were such that she reasonably ought to have had such knowledge." *Murdock* v. *Murdock,* 219 Ill. 123.

This agreement, if otherwise valid, the husband having died leaving no one entitled to share with the widow in the enjoyment of homestead and widow's award provided by the statute, is sufficient to bar homestead, dower, (*Merki* v. *Merki,* 212 Ill. 121,) widow's award and thirds. *Kroell* v. *Kroell,* 219 Ill. 105; *Pavlicek* v. *Roessler,* 222 id. 83.

It is true that in the case of *McMahill* v. *McMahill,* 105 Ill. 596, it was held that an ante-nuptial agreement could not bar the wife's claim to homestead after the death of her husband, even where the husband left no minor children. The decision was based upon the ground that the homestead could be extinguished only in one of the modes provided by statute, and that an ante-nuptial agreement was not one of such modes. From the judgment there, three members of the court dissented. That case was followed or referred to with approval, however, in *Crum* v. *Sawyer,* 132 Ill. 443, *Achilles* v. *Achilles,* 137 id. 589, and *Christy* v. *Marmon,* 163 id. 225.

In the case of *Zachmann* v. *Zachmann,* 201 Ill. 380, the question of the release of the homestead exemption by an ante-nuptial agreement was again under consideration, and it was there held that such an agreement would not extinguish the right to the homestead where the husband died leaving minor children. The reasoning of that case, however, as well as that of *Kroell* v. *Kroell, supra,* and *Pavlicek* v. *Roessler, supra,* leads to the conclusion that if there were no minor children the ante-nuptial agreement would be effective.

In the case of *Merki* v. *Merki,* 212 Ill. 121, it was expressly held that where there were no minor children whose rights in the estate of homestead intervened, it was competent for the husband and wife, "by agreement, to bar the dower of the wife and relinquish the interest of the wife in the homestead estate." If husband and wife may by a post-nuptial agreement extinguish the right to homestead, it is at once apparent that the same thing may be done by an ante-nuptial agreement. On reason there never was any distinction between an ante-nuptial contract attempting to bar the right to widow's award and one seeking to extinguish the homestead right of the wife. Both are founded upon the same considerations of public policy and both are for the benefit of the widow and minor children. Where there are no minor children at the death of the husband, the widow's award and the homestead benefit none but the surviving wife. Neither the law nor public policy furnishes any good reason, under such circumstances, for relieving her from the operation of her ante-nuptial contract entered into by her with complete understanding of its effect, by which she released and waived her rights to the award and to homestead. The *McMahill case* must yield to the later decisions.

In the case at bar it appeared from the evidence offered for appellees, and the court found, that Mr. Creel prepared the contract at the request of Colbert about a month prior to the marriage; that some days after its preparation appellant came to his office and he read the contract to her and explained its provisions; that the extent of Colbert's property was then discussed between them. The fact that Colbert then owned an eighty-acre farm was mentioned. Appellant then expressed herself as being satisfied with the contract, and a few days later, and before the marriage, she and Colbert came together to Mr. Creel's office and the contract was then signed in his presence and in the presence of H. H. Stephens. At that time Colbert owned the eighty

acres of land referred to, which was then worth from $4800 to $5600. Appellant was then the owner of $1200 in personal property. After the marriage the farm was sold, the real estate involved in this suit was purchased for $1700, and the $5000 in personal property owned by Colbert at the time of his decease grew out of the remainder of the proceeds of the farm. It thus appears that appellant, at the time of entering into the ante-nuptial contract in question, had full knowledge of the nature and character of Colbert's property, and as she was familiar with the farm itself and had theretofore had an interest in farm land in the same vicinity, the circumstances were such that she reasonably ought to have had knowledge of the value of this farm.

There is no foundation for the contention that the agreement is so unreasonable and unfair to appellant that any presumption against its validity arises. The agreement was reciprocal. Each released and waived all rights in the property of the other, and these mutual covenants, and, in fact, the marriage itself, constituted a sufficient consideration for the contract.

The appellant did not read nor write, and it is urged that the evidence shows that she did not understand the effect of the alleged ante-nuptial agreement. Appellant herself testified, after the evidence of the executor had been taken, that she never had any such conversation with him as he detailed, and that she never signed the contract at all and never heard of its existence until shortly before her husband's death. On these propositions the chancellor found that the preponderance of the evidence was against her, and we are not able to say that he erred in so doing. The evidence of Mr. Creel is the only evidence in the record showing, or tending to show, what took place at the time when he says he and she first conversed about this contract. He testifies that he read it to her and explained it to her, and that she said it was satisfactory to her; that she "didn't want any of his property," and "that he had children and

she had children, and they wanted the children on either side to be satisfied." If this evidence be true, and upon this record we think it should be so regarded, it is apparent that, notwithstanding her inability to read and write, she fully understood the contract.

The decree of the circuit court of McDonough county will be affirmed.

*Decree affirmed.*

Mr. JUSTICE DUNN, dissenting:

Without the testimony of T. Z. Creel the decree cannot be sustained. The complainant objected to his competency as a witness because he was the executor of the will, was a party to the suit and was interested in its result. Her objection was overruled, the court heard and considered his testimony, and upon it, alone, the decree is based. If incompetent evidence is admitted over objection on the hearing of a cause in chancery, it is not ground for reversal if the competent evidence appearing in the record is sufficient to sustain the decree. In such case it will be presumed the court disregarded the incompetent evidence. But there can be no such presumption in this case because the testimony of Mr. Creel is the only evidence in the record that Mrs. Colbert knew the character and extent of her intended husband's property, and it is conceded that such knowledge was essential to defeat her claims. Whether the overruling of the objection to the competency of the witness is assigned for error or not is immaterial. The chancellor had no right to consider, on the hearing, incompetent evidence which was objected to, and the assignment that the decree is not sustained by the evidence raises the question whether the decree is supported by evidence which the chancellor had a right to consider. If the evidence was objected to and was incompetent we are bound to presume the chancellor did not consider it, and if he did not consider it there is no evidence on which the decree can be sustained.

In *Tunison* v. *Chamblin,* 88 Ill. 378, it is said (p. 382) : "It is also urged that the court below erred in the admission of improper evidence. This court will never, in a chancery proceeding, reverse for that reason, even where it is apparent on the face of the record. The court hears and determines the case upon the proper evidence before it, and, whatever may be before it, we will presume the court only considered the legitimate evidence pertinent to the issues and that the decree was based on it, and when the record is brought to this court the case will be heard on the proper evidence contained in the certificate of the judge who tried the case, disregarding all irrelevant and improper testimony. This has been so repeatedly announced by this court that it must be held to be the settled practice."

In *Goelz* v. *Goelz,* 157 Ill. 33, it is said (p. 40) : "The question before us concerns the legal competency of certain evidence, and the question arises, not in an action at law, but in a suit in equity. In *Swift* v. *Castle,* 23 Ill. 132, this court said : 'The question presented upon the trial before the chancellor, as well as in the Appellate Court, is, upon all the legitimate evidence in the cause, what decree should be rendered? The chancellor being the judge of both the law and evidence, the presumption is that in rendering his decree he will only regard that which is legal and pertinent. * * * It is the correct practice for the chancellor, after the evidence is heard, to regard no portion of it which is immaterial or illegal and to decide the case alone on the legal evidence adduced. Such is believed to have been the uniform practice, which has been adopted from considerations of convenience and is in no way calculated to hinder or delay the administration of justice, and no reason has been suggested, nor is any perceived, why it should be changed.' In *Treleaven* v. *Dixon,* 119 Ill. 548, it was said : 'In chancery cases the whole record, including all the evidence offered, is before us, and we are required to assume that all the incompetent evidence was rejected and all the

competent evidence was admitted and considered on the final hearing. If there is competent evidence in the record sufficient to sustain the decree it must be affirmed; if not, it must be reversed,—and this without regard to whether the chancellor may have been right or wrong in his views as to the competency of the evidence at the hearing.' And to the same effect are *Stone* v. *Wood*, 85 Ill. 603, *Tunison* v. *Chamblin*, 88 id. 378, *Moore* v. *Tierney*, 100 id. 207, *Ritter* v. *Schenk*, 101 id. 387, *Smith* v. *Long*, 106 id. 485, *Gordon* v. *Reynolds*, 114 id. 118, and numerous other cases."

There was no waiver of the objection, no consent to the consideration of this evidence which the chancellor, if the objection was well taken, had no right to consider, and therefore I do not think the decree should be sustained upon such evidence alone, received over the complainant's objection, without determining that it was competent evidence in the case.