In re ESTATE of George D. YOUNGBLOOD, deceased, Respondent,

v.

Lodusca YOUNGBLOOD, Appellant.

No. 55213.

Supreme Court of Missouri, En Banc.

Sept. 14, 1970.

Ruyle & Henry, Neosho, for Estate of George D. Youngblood, deceased.

Frieze & Crandall, Carthage, for Beneficiaries and Devisees.

A. L. Shortridge, Joplin, for appellant.

ROBERT E. HOGAN, Special Judge.

On appeal from the probate court, the Circuit Court of Newton County held that an antenuptial contract executed by the appellant and her deceased husband constituted a valid waiver of all of the appellant's property rights in her husband's estate. Mrs. Youngblood appealed to the Springfield Court of Appeals, which transferred the cause here for want of jurisdiction. In re Estate of Youngblood,˙ Mo. App., 447 S.W.2d 824. The sole question tendered is whether or not the antenuptial contract is valid and effective under the provisions of § 474.220, RSMo 1959.

At the time of their marriage on October 10, 1966, George and Lodusca Youngblood were about 68 years old. They had attended grammar school together and were well acquainted. Both had been married and both had reared families on nearby farms in Newton County. In "May or June" of 1966, they went to the office of Mr. George Henry, an attorney in Neosho, advised him that they were contemplating marriage, and asked him to prepare an agreement which would permit each of them to devise his (or her) property to his children, free of claims by the other. Mr. Henry did so, and on October 7, 1966, George and Lodusca executed the contract which is now in question. As material here, the agreement recites that the parties intend to be married; that George is a widower with nine children, eight living and one deceased with issue; that Lodusca is a widow with two children; and that

each "is possessed of both real estate and personal property the extent of which has been fully and frankly disclosed by each of the parties hereto unto the other." Reciting further that "the parties intend this agreement to be in full discharge of all rights of inheritance and all other statutory rights under the statutes as they now exist or as they may be amended pursuant to the provisions of Section 474.120 and Section 474.220, Revised Statutes of Missouri, and pursuant to any powers under common law or [in] equity to fully discharge all such rights," the agreement then provides that during the joint lives of the parties each shall have full power of disposition and control over his or her property as if he or she were single, and that either of the two parties will execute any instrument necessary to carry out the contract. The agreement then concludes: "Upon the death of either party, this contract shall fully discharge all rights of inheritance and all other statutory rights in the estate of the other and neither shall have any interest, rights or claim in or to the estate of the other by virtue of any law whatsoever so that all of the estate of the first to die shall go and be disposed of as if said party had continued single and unmarried unless either party shall hereafter provide otherwise by inter vivos or testamentary instrument, but if there be such a will there shall be no right to elect to take against such will." The contract is signed and acknowledged by both parties.

At the time the contract was signed, George owned two farms, one a 240-acre farm "about half a mile or three quarters north" of the farm on which Lodusca lived, and the other a 20-acre farm which is referred to as the "home place." The 240-acre farm was encumbered by a deed of trust securing payment of a note to the Federal Land Bank in the sum of $11,094.-65. The "home place" was mortgaged to secure a note in the sum of $1,500. George also had some personal property, inferably worth $5,000–$5,500 at the time the agreement was made. Lodusca owned an 83-acre farm and some personal property— four or five cows, some farm machinery and "household stuff," but the value of her property was not established. The record does show that a short time after she signed the antenuptial contract Lodusca executed a last will and testament leaving all her property to her two children and a grandchild. This will does not mention the antenuptial contract.

On July 12, 1967, George sold the 240-acre farm to a concern identified only as Moark Construction Company for $45,000. Of this amount, George realized a little more than $34,000 after the encumbrance was discharged and taxes and expenses of the sale were paid. The purchaser gave a note in the sum of $31,950 in partial payment. Although Lodusca joined in the conveyance, the note was made payable to George only. On September 11, 1967, George made a last will and testament which contained no provision for Lodusca, but recited that "prior to our marriage we entered into a premarital agreement fully and finally determining and settling all rights to the property of the other  *  *."

George died on April 3, 1968. His will was admitted to probate and the inventory and appraisement filed shows that he still owned the "home place," valued at $10,000, and that he owned personal property valued at $35,298.84. Lodusca filed an election to take against the will, and applied for her exempt property, a family allowance, and a homestead allowance. In the probate court, the antenuptial agreement was set up in bar of the election and in bar of the statutory allowances for which she prayed, and after a hearing the probate court found that the antenuptial contract was valid and that it constituted a bar to Lodusca's election.

Lodusca then appealed to the circuit court. In that court she testified, as we have said, that she and George had attended grammar school together; as she put it, "[j]ust the eighth grade is all we went to." She had been "just on the farm,

a housewife," and had had no training in business affairs. Prior to her marriage to George, she had lived on the farm we have mentioned, but she didn't "know what it would be valued at, not too high because the buildings are old." This farm was, as we have noted, within a mile of George's 240-acre tract.

George had told Lodusca he was "heavy in debt," but, she added, "I didn't know he was in debt so much." She had known that George owned the two tracts of realty, and she was familiar with both, but she did not know what either was worth. She testified that she had signed the antenuptial contract so her children would receive the property which she and their father had owned. She had gone to Mr. Henry's office, she testified, but when she started to say something or ask a question, Mr. Henry and George had said, "No argument," and in her words, "I never did have a word to say in it." Lodusca emphatically denied that the terms of the antenuptial agreement had been explained to her, and she denied that any of the applicable law was discussed or explained by Mr. Henry before she signed the instrument.

Mr. Henry testified at length, and without objection, concerning the execution of the antenuptial contract. In substance, his evidence was that George and Lodusca had come to his office several months before they were married, and had said, in his words, that " * * * they wanted to get married and they wanted their own kids to have what each of them had * * *." Mr. Henry knew generally what George owned, and Lodusca told him that she owned a farm. Lodusca gave Mr. Henry the names of her children, George gave the names of his, and Mr. Henry set a tentative date for execution of the agreement. They did not' come back at once, but delayed execution of the agreement to inquire whether or not Lodusca's "social security" payments would be diminished or cut off if she married. Finally, on October 7, 1966, George and Lodusca returned and signed the contract.

Mr. Henry's recollection was that George and Lodusca had consulted with him on three occasions. On the first occasion, Mr. Henry had explained a surviving spouse's property rights in an intestate estate, had compared those rights with those which accrue in a testate estate, and had tried to explain the nature of the allowance of exempt property, the family allowance and homestead allowance. Mr. Henry had gone over these same matters again in October before the contract was finally signed. He was unable to say whether the parties read the contract or whether he read it to them, "but one or the other happened."

Mr. Henry testified that he asked George and Lodusca specifically if they had "made full disclosure to the other of what they had," and while the words "full disclosure" were his, they, George and Lodusca, said they had done so. He had told them a full disclosure was necessary, and while there was no discussion of specific property values, he "went down the list as to what each would take in the absence of a will and with a will * * * and in the absence of a contract." In Mr. Henry's office, George and Lodusca had discussed George's two farms, his cattle and his farm machinery, and Lodusca's farm, but they did not mention money values and Mr. Henry was unable to say "what conclusions they drew as to value."

Upon this evidence, the trial court made rather elaborate findings of fact and conclusions of law. It concluded, among other things, that the antenuptial contract was made upon a valid and adequate consideration, that a full disclosure was made by both parties, and that the agreement was fair and reasonable to Lodusca Youngblood. It found no evidence that the appellant had been imposed upon or overreached, and concluded that the contract in suit constituted a valid waiver of all the appellant's property rights in the estate of her deceased husband. Procedurally, the case is before us for review of the same scope as any other court-tried case;

we review the case upon both the law and the evidence, giving due regard to the opportunity of the trial court to judge the witnesses' credibility. We do not set aside the judgment unless it is clearly erroneous. Rule 73.01(d), V.A.M.R.; Estate of Rogers v. Courier, Mo., 429 S.W.2d 258, 262 [1]; Cranford v. Langston, Mo.App., 356 S.W. 2d 581, 584 [1].

Some preliminary observations should be made. What we have before us is an antenuptial contract in which each prospective spouse undertook to renounce *all* rights which either might acquire in the property of the other as surviving spouse. The validity of the contract is governed by the provisions of § 474.220, although that section refers to and is couched in terms of a surviving spouse's right to elect, and relinquishment of the right to elect, without more, would not bar the surviving spouse's right to a homestead allowance under § 474.290. Owen v. Riffie, Mo., 323 S.W.2d 765, 770 [3]. We do not comment generally on all types of property settlements between husband and wife; such contracts are infinitely varied and have infinitely varied purposes. We merely observe at this point that contracts between prospective spouses which are in effect mutual waivers of property rights in the estate of the other are now governed by statute— § 474.120 if the estate is intestate, and § 474.220 if the estate is testate. In re Adelman's Estate, Mo.App., 377 S.W.2d 549, 553 [5].

Section 474.220, by which the validity of this contract must be measured, reads as follows (our emphasis):

"The right of election of a surviving spouse hereinbefore given may be waived before or after marriage by a written contract, agreement or waiver signed by the party waiving the right of election, *after full disclosure of the nature and extent of the right, if the thing or the promise given to the waiving party is a fair consideration under all the circumstances.* This written contract, agreement or waiver may be filed in the same manner as hereinbefore provided for the filing of an election."

■ This section is Section 39 of the Model Probate Code, adopted without change or modification as part of the Probate Code of 1955. L.1955, p. 385, § 258. We need not burden this opinion with an extensive discussion of the background of the statute; it is sufficient to say that the Model Probate Code treats waivers of the right to elect as a species of antenuptial (or postnuptial) property settlement. These transactions have their origin in common law contracts to bar dower, and as the framers of the Model Probate Code point out, the rules applied to determine their validity are unique and quite distinct from the requirements for the execution of a simple contract. Model Probate Code § 39, p. 75 (Simes ed. 1946).[1] A reasonably careful examination of the background of § 474.220 convinces us that the statutory requirements of a valid waiver of election do not really differ from those which would be inferred or deduced from the recent Missouri cases. In general terms, the statutory requisites of a valid waiver of the right to elect are: (1) That there be a full disclosure of the nature and extent of the right being waived; this requires disclosure of the nature and extent of the property interests of the prospective spouses, or knowledge equivalent to such disclosure; Mathis v. Crane, 360 Mo. 631, 641, 230 S.W.2d 707, 712 [3–5]; Jones v. McGonigle, 327 Mo. 457, 464, 37 S.W.2d 892, 894 [1]; Anno., supra, 27 A.L.R.2d at 886–888, § 3; and (2) that there be a "fair consideration under all the circum-

---

1. Those interested, if any, in the general subject may consult 1 American Law of Property, §§ 5.39–5.40, pp. 719–724 (Casner ed. 1952); Annos., 27 A.L.R.2d 883 (1953); 49 A.L.R. 116 (1927); Notes 9 L.R.A. (N.S.) 953 (1907); 2 L.R.A. 372 (1889); Ronken, Ante-Nuptial Contracts; Their Origin and Nature, 24 Yale L.J. 65 (1914).

stances," which not only requires that there be such consideration as would support a simple contract, but further that the consideration moving to the spouse or prospective spouse surrendering marital rights be fair and equitable in the particular circumstances. McQuate v. White, Mo., 389 S.W.2d 206, 212, 213 [6] [11, 12], and see Restatement, Property, § 316, comment (d), pp. 1796–1797 (1940), to which the editorial comment to § 474.220 refers. Section 474.220 states these requisites separately, but in application they overlap to a considerable degree.

On this appeal, the appellant argues that there was neither a full and fair disclosure nor a fair consideration in the circumstances. In support of her argument, she has cited 14 decisions of the Missouri courts, beginning with Mowser v. Mowser, 87 Mo. 437, decided in 1885, and running through McQuate v. White, supra, 389 S. W.2d 206, decided 80 years later. Some of the cases the appellant cites to the proposition that the consideration moving to Lodusca Youngblood was not a fair consideration in the circumstances can be readily distinguished on a purely historical basis. From 1825 until 1963, we had a species of jointure statute[2] which our courts, in general, construed to require that all marriage settlements, by way of conveyance or agreement, make a specific provision from the estate of the husband for support of the widow during her life. See Quint v. Quint, Mo.App., 359 S.W.2d 29, and 4 Maus, Missouri Probate Practice, § 1241, pp. 439–441 (1960). Present § 474.220 makes no such requirement, although of course inadequate provision for the surviving spouse may render the contract invalid for want of a fair consideration. Other cases cited by the appellant, e. g., Bloss v. Bloss, Mo., 251 S.W.2d 78, and Johns v. McNabb, Mo., 247 S.W.2d 640, involve considerations not present in this case, but we need not discuss or attempt to compare all the authorities cited pro and con by the parties; the substance of the appellant's argument regarding consideration is that there was such disparity between the value of the property owned by Lodusca and that owned by her husband that a mutual waiver was not a fair exchange.

■■■ It may be conceded that the relative wealth of the two parties is one factor among many to be considered in determining whether or not this contract is equitable and fair to Lodusca, the surviving spouse. 41 C.J.S. Husband and Wife § 97, p. 568. The difficulty with this aspect of the appellant's argument is, in the first place, that the respective property valuations were not shown, even though counsel have assumed they were. Lodusca testified that when she signed the agreement, she owned an 83-acre farm, but added that she "didn't know what it would [have been] valued at, not too high because the buildings are old." She was asked if she had listed the property for sale. She had, but was unable to say how much she had asked for it. Two tax receipts were offered and received in evidence, not for the purpose of showing the value of Lodusca's real property, but only for the limited purpose of showing its description. Lodusca testified that she had had a bank account, but she could not recall how much. When she was married to George, she had had "four or five cows and they had calves," but she didn't know their value. She also had owned a tractor, about 20 years old, and some "household stuff." This is substantially all the evidence bearing on the value of Lodusca's property at the time the contract was executed. Granting that the inventory and appraisement filed in the probate court showed that George owned real and personal property appraised at $45,298.84, and that the inventory and appraisement was some evidence of the value and extent of George's property when the contract was made, McQuate v. White,

2. The original statute, § 5, p. 333, R.S. 1825, was modified slightly in 1955, L. 1955, p. 385, § 247. The original jointure statute was codified as § 469.160 in the 1949 revision.

supra, 389 S.W.2d at 212, the record before us simply does not permit an accurate comparison of the assets of the two parties to the contract at the time it was executed. Moreover, the fairness of a marriage settlement must be determined as of the date of the agreement. Del Vecchio v. Del Vecchio, Fla., 143 So.2d 17, 20 [6]; Christians v. Christians, 241 Iowa 1017, 44 N.W. 2d 431, 433–434 [8]; Rolfe v. Rolfe, 125 Me. 82, 130 A. 877, 878 [3]; In re Estate of Vallish, 431 Pa. 88, 244 A.2d 745, 747 [2]. A simple comparison of George's assets at his death with those of his prospective spouse at the time the contract was signed does not fully present the equities of the bargain at the time it was made. When the contract was signed, Lodusca's modest assets were clear and unencumbered. We have no doubt that she lived modestly, but her resources and income seem to have been adequate to her needs; though, as we say, we do not know the size of it, Lodusca had a checking account in the Citizens State Bank of Granby. She does not seem to have regarded her marriage to George as a financial step up in the world; indeed, she delayed her marriage, it seems, because she feared she might lose her social security payments if she did so. George, on the other hand, owned more land than Lodusca, but his land was encumbered; at the time of his marriage he owed $11,094.65 on the large farm and $1,500 on the "home place." George's farms, as such, do not appear to have been very productive. The Youngbloods' joint income tax returns for the years 1966 and 1967, received in evidence, indicate a farm income in 1966 of $5,231.61, of which $986.82 was "agricultural program payments," and a farm income of $1,555, almost all of which was from the sale of cattle, in 1967, the year the large farm was sold. We cannot say that the sale of George's 240-acre farm was a fortuity, but as appellant concedes in her brief, he sold it, paid his debts and became solvent. We believe that the disparity, if any, in the relative financial positions of the parties to this agreement developed to

a considerable degree after they were married, and as the court remarked in Christians v. Christians, supra, 241 Iowa 1017, 44 N.W.2d at 433–434, "[t]hat neither party to the contract contemplated this change in conditions does not require the cancellation of the contract."

However that may be, the ultimate inquiry in cases of this kind is whether the surviving spouse against whom enforcement of the agreement is sought has been defrauded or overreached. Lack of or inadequacy of provision for the surviving spouse may shift the burden of proof, Jones v. McGonigle, supra, 327 Mo. at 464, 37 S.W.2d at 894 [3], but if the surviving spouse had full and actual knowledge of the other's means and the extent of his (or her) property, or knew facts sufficient to charge him with such knowledge, then the contract may not be avoided by the surviving spouse on the ground that the provision for her (or him) is inadequate or less than she would have received in the absence of an agreement. This court so held by inference in McQuate v. White, supra, 389 S.W.2d at 213 [11, 12], and such is the general law. See Del Vecchio v. Del Vecchio, supra, 143 So.2d at 20 [2, 3] [4]; Herman v. Goetz, 204 Kan. 91, 460 P.2d 554, 557 [1] [2] [3]; In re Estate of Strickland, 181 Neb. 478, 149 N.W.2d 344, 352–353 [23–27] [28]; Juhasz v. Juhasz, 134 Ohio St. 257, 16 N.E. 2d 328, 331 [1–3] [4], 117 A.L.R. 993, 998; 41 Am.Jur.2d Husband & Wife, § 298, p. 245; 41 C.J.S. Husband & Wife § 97 (b), pp. 569–570. Section 474.220 states the same principle in different language. In terms, it requires only that there be a "full disclosure of the nature and extent of the right [of election]," but obviously something more than an abstract explanation of the right of election is called for, and just as obviously if the party surrendering marital rights knows the nature and amount of the other's property, then there is no reason for a ritual of disclosure by contractual recital, or by listing the property of each party in the agreement.

No satisfactory rule as to the sufficiency of disclosure or equivalent knowledge can be formulated in concrete terms, for this is ordinarily dependent on the circumstances of the case. If there has been a positive concealment, as in Mathis v. Crane, supra, 360 Mo. 631, 230 S.W.2d 707, 27 A.L.R.2d 873, the agreement may be set aside, and if the prospective spouse surrendering marital rights has been overreached or imposed upon, contractual recitals will not save the agreement. See Egger v. Egger, 225 Mo. 116, 123 S.W. 928, 135 Am.St.Rep. 566. If, on the other hand, the parties stand in a relatively equal bargaining position, and the prospective spouse knows or should know facts sufficient to enable him or her to evaluate the agreement, then the contract may be valid even though the provisions for the survivor are grossly disproportionate to the deceased spouse's means. See, e. g., Rocker v. Rocker, 13 Ohio Misc. 199, 232 N.E.2d 445; In re Kaufmann's Estate, 404 Pa. 131, 171 A.2d 48.

■ Without attempting to enumerate all the circumstances which should be considered in determining whether or not a party to a marriage settlement has entered into the agreement with her (or his) eyes open, we note that this case presents a relatively simple and homely situation. George and Lodusca were on a relatively equal bargaining basis; they had approximately the same education, and both had reared their families and had accumulated their property in the same rural community in southwest Missouri. If Lodusca's business experience was not equal to George's, it does not appear that there was any gross disparity between the two parties' abilities to understand and consummate a business transaction, as was the case in Egger v. Egger, supra, where the wife had never transacted any business and could not understand English. In addition, this marriage was a marriage of convenience. We do not say this circumstance destroys the confidential relationship which is said to require that a full disclosure be made, but

it makes it unlikely that Lodusca's business judgment was clouded by any notions of romantic love. See Anno., supra, 27 A.L.R. 2d at 889–891.

With respect to the sufficiency of disclosure, the appellant's argument is that George's net worth was never really discussed, that the parties did not understand the term "full disclosure," and that Lodusca could not have understood what she was waiving unless she knew the net worth of George's assets at the time she signed the marriage settlement. It is, of course, a common practice to list the prospective spouse's property in connection with a marriage settlement, or to itemize and give details of the holdings of each in the body of the agreement to show that each party is cognizant of the value of the other's property. Anno., supra, 27 A.L.R.2d at 895–897. This instrument simply recites in general terms that the parties thereto are fully informed of the property interests held by the other.

As we have said, the sufficiency of disclosure is a subjective matter, depending on circumstances. If a prospective spouse's property consisted of closely held stocks or other assets which are difficult to evaluate, as was true in Rocker v. Rocker, supra, 13 Ohio Misc. 199, 232 N.E.2d 445, then it might be contended, as it was there, that even a reasonably careful schedule of assets, without further explanation, would be insufficient. This is not such a case. George's real assets were assets of a simple and uncomplicated nature. Lodusca lived very close—"about half a mile or three quarters [south]"—to the 240-acre farm. She was familiar, she testified, with the home place. It is not improbable that the land George owned was very similar to her own. She had lived in the neighborhood for many years, and in addition Mr. Henry had carefully explained the nature of the rights she was giving up. Factually, this case is comparable to such cases as Colbert v. Rings, 231 Ill. 404, 83 N.E. 274; Peet v. Peet, 81 Iowa 172, 46 N.W. 1051; and Wulf v. Wulf, 129 Neb. 158, 261 N.W. 159,

in which similar contracts were sustained. Without going over the evidence again in detail, we believe the record shows that Lodusca had sufficient knowledge of the nature, extent and amount of George's property to enter into the contract understandingly and with knowledge of what she stood to gain or lose.

For the reasons indicated, we cannot say that the judgment is clearly erroneous, and it is therefore in all respects affirmed.

All concur except BARDGETT, J., not participating because not a member of the Court when cause was submitted.