In re The ESTATE OF Charles
Ray CASSIDY, Deceased

Carolyn A. Cassidy, Petitioner–
Respondent,

v.

Stephanie M. Cassidy, as Personal Representative of the Estate of Charles
Ray Cassidy, Respondent–Appellant.

No. SD 30025.

Missouri Court of Appeals,
Southern District,
Division Two.

Nov. 16, 2011.

Motion for Rehearing or Reconsideration
and
Transfer Denied Dec. 7, 2011.

Application for Transfer
Denied Jan. 31, 2012.

Patrick W. Keefe, Ellisville, MO, for Appellant.

Mathew G. Eilerts, III, Clayton, MO, for Respondent.

JEFFREY W. BATES, Judge.

This is an appeal brought by Stephanie Cassidy (Stephanie), in her capacity as the personal representative of the Estate of Ray Cassidy (Ray), from a judgment issued by the probate division of the Circuit Court of Crawford County, Missouri.[1] The trial court entered a declaratory judgment determining that a written antenuptial agreement (Agreement) between Ray and his wife, Carolyn Cassidy (Carolyn), was void and could not be enforced by Stephanie against Carolyn in the estate proceedings. Because Stephanie failed to meet her burden of proving that the Agreement complied with the requirements of § 474.220, we affirm.[2]

## I. Standard of Review

We presume the trial court's judgment is correct. *Krepps v. Krepps*, 234 S.W.3d 605, 611 (Mo.App.2007). As the party asserting error, Stephanie bears the burden of demonstrating that the judgment is incorrect. *See id.*; *Elrod v. Elrod*, 192 S.W.3d 738, 740 (Mo.App.2006). Appellate review of this court-tried case is governed by Rule 84.13(d) and the principles articulated in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). "We review the evidence and all reasonable inferences in the light most favorable to the judgment and disregard all contrary evidence and inferences." *Arndt v. Beardsley*, 102 S.W.3d

---

1. Because several persons mentioned in this opinion share the same surname, we refer to each by their first name for purposes of clarity.

2. All references to statutes are to RSMo (2000). All references to rules are to Missouri Court Rules (2011).

572, 574 (Mo.App.2003). We defer to the trial court's determination of witness credibility and recognize that the court is free to accept or reject all, part or none of the testimony presented. *Christian Health Care of Springfield West Park, Inc. v. Little,* 145 S.W.3d 44, 48 (Mo.App.2004). In addition, this Court considers all fact issues upon which no specific findings were made to have been found in accordance with the result reached. Rule 73.01(c); *Surrey Condominium Ass'n, Inc. v. Webb,* 163 S.W.3d 531, 536 (Mo.App.2005). Our summary of the facts, which is set forth below, has been prepared in accordance with these principles.

## II. Factual Background

Ray lived on a 570–acre farm that he owned in Cherryville, Missouri. Helen Franklyn (Franklyn) owned 85 acres of land that adjoined Ray's farm. When Franklyn bought her property in 1970, she paid $3,000 per acre for one 45–acre parcel of land and $2,500 per acre for one 40–acre parcel of land.

In June 1995, Ray executed his will. The will named his daughter, Stephanie, as his sole beneficiary and personal representative of his estate. Ray was single when he executed his will. He and Carolyn first met in October 1995. At that time, Carolyn was 55; Ray was 61. Carolyn lived in a house that she owned in Clark, Missouri. She had a high school education and worked as a secretary at the University of Missouri (MU).

Around May 30, 1996, Ray proposed to Carolyn. He also asked what she thought about a prenuptial agreement. Carolyn responded that she had never had one and did not know any attorneys. Ray suggested that they use his attorney to draft the Agreement. He told Carolyn that she did not need her own attorney. The wedding was scheduled to take place at 2:00 p.m. in Sedalia, Missouri, on June 28, 1996. Ray selected the date and place for the wedding. He would not allow Carolyn to tell her two sons or anyone at MU that she was getting married.

Ray had been represented on five other occasions by attorney J. Kent Robinson (Robinson). On June 8, 1996, Ray asked Robinson to prepare the Agreement. Ray supplied all of the information concerning the list of property, values and debts attached to the Agreement. No one at Robinson's office ever spoke to Carolyn, and she had no attorney of her own. In mid-June, Ray obtained the address of Carolyn's house in Clark from her and provided it to Robinson.

Robinson drafted the Agreement, which consisted of: (1) the five-page Agreement itself; (2) a Schedule A listing property, debts and income; and (3) an Exhibit A containing the legal description of several parcels of land in Crawford County.[3] The Agreement stated that it was made pursuant to § 451.220.[4] Section 3 of the Agreement stated, *inter alia,* that "[e]ach of us waives and releases all rights, claims and interests he/she may acquire in the property now owned by the other which might

---

**3.** Schedule A stated that Ray owned "[r]eal estate located in Cherryville, Crawford County, MO.¹" Footnote 1 said "Legal description attached as Exhibit 1." There was no Exhibit 1 attached to the Agreement. There was an Exhibit A, which set out the legal descriptions for three parcels of land in Crawford County that were approximately 45, 219 and 306 acres in size, respectively.

**4.** This statute states: "All marriage contracts whereby any estate, real or personal, in this state, is intended to be secured or conveyed to any person or persons, or whereby such estate may be affected in law or equity, shall be in writing, and acknowledged by each of the contracting parties, or proved by one or more subscribing witnesses."

have otherwise arisen by virtue of our marriage." Section 11 stated:

> **Rights of surviving spouse**—Each of us agrees to fully accept the provisions of any testamentary, *inter vivos* or beneficiary instrument made by the other. Neither shall have any obligation, contractual or otherwise, to make any other testamentary provision for the other. Except as herein stated, each of us waives and releases all rights, claims and interests of every kind, nature and description which may arise as a consequence of the death of the other including, but not limited to, the following: **(a)** Each of us, pursuant to Section 474.120, releases and waives all rights of inheritance and any other statutory rights of a surviving spouse of a decedent who dies intestate. **(b)** Each of us, pursuant to Section 474.220, releases and waives all rights under Section 474.160, to make an election as a surviving spouse to take against the will of the other. **(c)** Each of us releases and waives all rights to claim any property of the estate of the other as exempt pursuant to Section 474.250, to claim a support allowance pursuant to Section 474.260 or to claim any portion of the estate of the other as a homestead allowance pursuant to Section 474.290.

In relevant part, Section 14 stated that "[e]ach of us consulted with an independent attorney concerning the nature, terms and effect of this agreement. Our attorneys have advised of the rights and interests which normally arise as a consequence of a marriage and we are fully aware that many of those rights are being forever waived under this agreement." Section 15(b) stated that "[e]ach party has been given the opportunity to have the nature, terms and consequences of this Agreement reviewed for him/her by legal independent counsel of his/her choosing." According to Schedule A, Carolyn had net assets of $22,000, and Ray had net assets of $321,398. This schedule, however, valued Ray's 570 acres of land in Cherryville at only $200,000, or an average of $350 per acre. If this property was worth as much as Franklyn's adjoining land, then Ray's real estate alone was worth between $1,425,000 and $1,710,000.

The preparation of the Agreement concluded at 3:22 p.m. on June 26, 1996. Either that day or the next, Ray picked up four copies of the Agreement from Robinson's office. It was Robinson's usual custom or practice to advise his clients not to execute a prenuptial agreement on the same day as the wedding. Robinson gave the following explanation for that advice:

Q. Well, and you said that's your usual custom or practice to advise clients not to sign the prenup on the date of the wedding. Why?

A. Because based upon Missouri case law, the courts always scrutinize whether or not there has been any undue influence or undue pressure placed upon a party to execute an agreement. So we will—we will advise clients that the party to whom they are to be married should have ample opportunity to review the agreement and have it reviewed independent—independently by counsel of their choosing before it's executed.

At around 8:00 a.m. on June 28, 1996, Ray and Carolyn were at her house in Clark when Ray handed Carolyn a copy of the Agreement. Carolyn was shocked, surprised and overwhelmed. This was the first time she had seen the Agreement, and the wedding was scheduled to take place in six hours. She had no idea Ray was going to present the Agreement to her that morning. She had no input in draft-

ing it, and she did not have time to review it in detail. She had not seen Schedule A, which purported to list the parties' property and debts, until that morning when Ray handed her the Agreement. She provided none of the information in Schedule A concerning the value of her assets or the amount of her liabilities. Schedule A stated that Ray owned "[r]eal estate located in Cherryville" with a stated value of $200,000. No address for this real estate was stated. A footnote stated that the legal description for this real estate was "attached as Exhibit 1." She did not see an Exhibit 1 attached to the Agreement. In addition, the first page of Schedule A stated at the bottom that it was "Page 1 of 3." There was another page stating at the bottom that it was "Page 2 of 3." There was no "Page 3 of 3" attached to the Schedule A that she reviewed. It did not appear to Carolyn that she had been given a complete copy of Schedule A. She was not given any supporting documentation concerning the assets in Ray's column in Schedule A, and she did not have time before the wedding to investigate whether the list of assets and values was complete or correct. The section of the Agreement that was supposed to state the parties' respective annual incomes had not been filled out.[5] Carolyn thought the Agreement would only apply if they got divorced. She did not understand that it also applied if one of them died. The Agreement contained a number of references to Missouri statutes. No one explained to Carolyn what these statutes meant. She did not understand what rights she was waiving as a surviving spouse by signing the Agreement. She did not know what it meant for a spouse to elect to take against a will.

As soon as Ray handed the Agreement to Carolyn, he said "[c]ome on, we've got to hurry to Columbia and get this document signed so we can get married." Carolyn knew that it would take them approximately 45 minutes to get dressed and drive to Columbia. She "looked over" the Agreement, without reading it word for word, and realized that she did not understand it. When she said she had some questions about the Agreement, Ray replied, "[d]on't worry about it. This is just protocol." He also told Carolyn that, "[a]nything we buy together, anything we do together, anything we have together, any changes we want to make, we can make them. Don't worry about it. This is the formality that they use." Ray repeated that they had to "[h]urry and sign this so we can get married." Carolyn felt pressured to hurry up and sign the Agreement so they could get married that day. She did not have time to get an attorney to review the Agreement with her. She also did not contact her two sons about the Agreement because Ray had forbidden Carolyn from discussing the wedding with her children. Carolyn believed that, if she did not sign the Agreement, Ray would not go through with the wedding.

Ray and Carolyn drove for 45 minutes to the Boone National Savings and Loan in Columbia so they could sign the Agreement in the presence of a notary. Although Ray was driving the vehicle, Carolyn was not able to read the Agreement on the way to the bank because Ray kept the document in his possession. They arrived there at 9:00 a.m., executed the Agreement and left 15 minutes later. Carolyn signed the Agreement because she trusted Ray. She picked up some shoes and flowers for the wedding. She and Ray then returned

---

**5.** At some point after the Agreement was signed, Ray apparently filled out those blanks in his own handwriting. His annual income and salary was shown as $25,000. Carolyn's annual income and salary was shown as $16,000.

to her home in Clark. She changed clothes, and they drove for 90 minutes to Sedalia, Missouri, to get married. The ceremony took place around 2:00 p.m.

During the marriage, Carolyn continued to work for MU. Ray also had a full-time job. In October 1996, Carolyn sold her house in Clark. She received $10,000 as proceeds from the sale. At Ray's direction, that money was placed in a jointly titled certificate of deposit. All of Carolyn's earnings from her employment were placed in a joint checking account that was used to pay household bills. In September 1997, Ray and Carolyn purchased a manufactured home that was placed on Ray's Cherryville farm, where the couple resided. Carolyn signed papers making her liable on the loan.

In January 2008, Ray died from injuries he sustained in a farming accident. Thereafter, Carolyn learned for the first time that Ray had executed a will leaving everything to his daughter, Stephanie. Carolyn also became aware that Ray had not fully disclosed all of his assets in Schedule A of the Agreement. Carolyn did not believe that Ray had disclosed: (1) the true value of the real estate that he owned; (2) his ownership of several antique cars; (3) his ownership of a road grader; (4) the tractor that he owned; (5) a motorcycle that he owned; (6) some antique tools; (7) a herd of cattle that he owned; (8) his life insurance policy at work; and (9) a work-related retirement annuity.

### III. Procedural Background

Ray died testate. His June 1995 will was admitted to probate in the Circuit Court of Crawford County, Missouri on February 13, 2008. Stephanie was appointed as personal representative of the estate. In Stephanie's capacity as personal representative of Ray's estate, she sought to enforce the Agreement in a probate proceeding. In April 2008, Carolyn filed a declaratory judgment action against Stephanie asking that the Agreement be declared void and unenforceable. In June 2008, this lawsuit was transferred to the probate division and designated as an adversary proceeding.

The case was tried in June 2009. The parties presented testimony from attorney Robinson, Carolyn and neighbor Franklyn. In addition, the Agreement and certain photographs were admitted in evidence.

In August 2009, the trial court decided to set aside the Agreement. The seven-page judgment contains extensive findings of fact and conclusions of law explaining the basis for the court's decision. Those most relevant to our analysis include the following:

1. Carolyn was a credible witness.

2. Carolyn did not understand the Agreement when it was presented to her by Ray on the morning of their wedding.

3. Carolyn was unrepresented, and she was not given sufficient time during the six-hour interval before the wedding took place to consult with an attorney about the meaning and effect of the Agreement.

4. Before Carolyn executed the Agreement, no one explained to her what it meant to elect against a will or what she would be giving up by waiving that right.

5. There was a lack of full disclosure of the nature and extent of the rights Carolyn was waiving by signing the Agreement.

6. Ray did not fully disclose his assets or the value of his property prior to Carolyn's execution of the Agreement, and she did not obtain actual or constructive knowledge of that

information through her relationship with Ray.

7. The Agreement was not supported by fair consideration under all of the circumstances.

8. Carolyn was "overreached and defrauded" by the Agreement, and it was unconscionable.

## IV. Discussion and Decision

■ Stephanie presents four points for decision, but we need address only the second because it is dispositive of all issues presented by this appeal. As the surviving spouse of a married person who died testate, Carolyn had a statutory right to elect to take against Ray's will. *See* § 474.160. Because Ray had lineal descendants, Carolyn was entitled to receive one-third of the estate after payment of claims if she exercised her right of election. *See* § 474.160.1(1). In the probate proceeding, Stephanie took the position that Carolyn waived her statutory right of election by signing the Agreement.[6] The validity of that purported waiver is governed by § 474.220. *See In re Estate of Youngblood,* 457 S.W.2d 750, 754 (Mo. banc 1970); *In re Estate of Murphy,* 661 S.W.2d 657, 660 (Mo.App.1983). In relevant part, this statute states:

> The right of election of a surviving spouse hereinbefore given may be waived before or after marriage by a written contract, agreement or waiver signed by the party waiving the right of election, after full disclosure of the nature and extent of the right, if the thing or the promise given to the waiving party is a fair consideration under all the circumstances.

§ 474.220. As the party relying upon the Agreement, Stephanie bore the burden of proving that it complied with the requirements of § 474.220. *See Murphy,* 661 S.W.2d at 661. One of the statutory requisites for a valid waiver is that "there be a full disclosure of the nature and extent of the right being waived...." *Youngblood,* 457 S.W.2d at 754.[7] Thus, Stephanie bore the burden of proving that Carolyn "knew or was advised of her rights of election." *Murphy,* 661 S.W.2d at 661. In addition, Stephanie had to prove that Ray fully disclosed the nature and extent of his property, or that Carolyn had knowledge equivalent to such disclosure. *Youngblood,* 457 S.W.2d at 754. "[T]he ultimate inquiry in cases of this kind is whether the surviving spouse against whom enforcement of the agreement is sought has been defrauded or overreached." *Id.* at 756.

> No satisfactory rule as to the sufficiency of disclosure or equivalent knowledge can be formulated in concrete terms, for this is ordinarily dependent on the circumstances of the case. If there has been a positive concealment, as in *Mathis v. Crane, supra,* 360 Mo. 631, 230

---

6. The June 1995 will, which was executed before Ray met Carolyn, contained no provision for her. No change was made to the will after Ray and Carolyn married. Pursuant to § 474.235, an omitted spouse is granted the statutory right to receive the same share of the estate that he or she would have received if the decedent had left no will. We note this solely to point out that the applicability of § 474.235 to the facts of this case was not addressed by the parties or the trial court, and we express no opinion on the matter. *Cf. Pulley v. Short,* 261 S.W.3d 701, 705 (Mo.App. 2008) (holding that, pursuant to § 474.235,

husband was entitled to an intestate share of the probate estate as a pretermitted spouse).

7. As this Court noted in *Murphy,* there was no question in *Youngblood* that the surviving spouse knew she had a right to elect to take against the will. Before Mrs. Youngblood signed the agreement, she was fully informed by an attorney about the right of election, and he carefully explained the nature of the rights Mrs. Youngblood was giving up. *Murphy,* 661 S.W.2d at 660.

S.W.2d 707, 27 A.L.R.2d 873 [ (1950) ], the agreement may be set aside, and if the prospective spouse surrendering marital rights has been overreached or imposed upon, contractual recitals will not save the agreement.

*Id.* at 757.

In Point II, Stephanie contends the trial court misapplied the law because the Agreement was enforceable, in that the document itself fully disclosed the nature and extent of the legal rights Carolyn was waiving. We find no merit in that argument.

As our Supreme Court explained in *Youngblood,* contractual recitals will not save an antenuptial agreement if the spouse surrendering marital rights demonstrates that there has been overreaching or imposition upon that spouse. *Id.* In the case at bar, the trial court made a specific finding that Ray had overreached and defrauded Carolyn. That finding is supported by the evidence. Ray only brought up the subject of an antenuptial agreement on two fleeting occasions before the morning of the wedding. No substantive discussions about the terms of the Agreement took place. Carolyn had no prior experience with an antenuptial agreement. Ray picked the attorney who drafted the Agreement and specifically told Carolyn that she did not need her own attorney. She had no input in drafting the Agreement and provided none of the factual information contained therein. Ray prohibited Carolyn from telling anyone about their impending marriage, which effectively kept Carolyn from discussing the subject of the antenuptial agreement with her family, friends or coworkers. Ray gave the Agreement to Carolyn only six hours before the wedding and insisted that they immediately sign it. By doing so, Ray ignored the advice of his own attorney that Carolyn should be given ample opportunity to read the Agreement and have it reviewed by independent counsel before signing. The Agreement itself presupposed that sequence of events because Section 14 stated that "[e]ach of us consulted with an independent attorney concerning the nature, terms and effect of this agreement. Our attorneys have advised of the rights and interests which normally arise as a consequence of a marriage and we are fully aware that many of those rights are being forever waived under this agreement." In reality, that contractual recital was false. The Agreement also stated that Carolyn was waiving her right "to make an election as a surviving spouse to take against the will of the other." She did not understand what that right entailed or what she would be giving up if she signed the Agreement. Indeed, she testified that she did not even understand that the Agreement applied if one of them died. When Carolyn told Ray that she did not understand the Agreement, Ray misrepresented the significance of the document by saying that it was "just protocol" or "a formality" that they could change in the future and that Carolyn should not be worried about it.

Ray also failed to fully disclose his assets in the Agreement. He grossly understated the value of his real estate in Schedule A, and he failed to list a number of assets at all. After the Agreement was signed, the evidence demonstrated Carolyn's continued lack of understanding of that document and further overreaching by Ray. Carolyn's only significant asset was her house in Clark. When that property was sold in October 1996, Carolyn received $10,000 as proceeds from that sale. According to the Agreement, that money belonged solely to her. At Ray's direction, however, that money was placed in a jointly titled certificate of deposit.

Because Carolyn presented evidence of fraud and overreaching by Ray, the contractual recitals in the Agreement were not conclusive. *Youngblood*, 457 S.W.2d at 757. The trial court found Carolyn to be a credible witness. Because Stephanie was the party that bore the burden of proof and her evidence was not conclusive, the trial court's decision that Stephanie's evidence was not credible requires us to affirm the judgment. *See U.S. Bank v. Lewis*, 326 S.W.3d 491, 495 (Mo.App.2010). No additional evidentiary support is even required to sustain the judgment in Carolyn's favor. *Id.*[8]

Based upon our review of the record, Stephanie failed to meet her burden of proving that: (1) there was a full disclosure to Carolyn of the rights she would be waiving by signing the Agreement; (2) there was a full disclosure by Ray of his assets and the value of his property; and (3) the circumstances attendant to the execution of the Agreement showed no overreaching or fraud by Ray. Consequently, Point II is denied.

Stephanie's other points are moot and need not be addressed. The judgment of the trial court is affirmed.

RAHMEYER, P.J., and FRANCIS, J., Concur.

**8.** Stephanie cites *Pulley v. Short*, 261 S.W.3d 701 (Mo.App.2008) to support her argument, but we find that case factually distinguishable. There, the trial court invalidated the antenuptial agreement because the husband was not afforded and did not seek legal counsel. The western district of this Court reversed the judgment as a misapplication of law because: (1) the husband had actual knowledge of wife's assets; and (2) he freely and voluntarily signed the agreement without even reading it or raising any questions or concerns about it. *Id.* at 707–08. Neither of those facts is present in the case at bar.